**STATE**

v.

**Richard R. LUSSIER.**

**No. 85–237–C.A.**

Supreme Court of Rhode Island.

June 25, 1986.

Arlene Violet, Atty. Gen., Jeffrey B. Pine, Asst. Atty. Gen., Thomas Dickinson, Sp. Asst. Atty. Gen., for plaintiff.

Mark L. Smith, Woonsocket, for defendant.

## OPINION

KELLEHER, Justice.

A Superior Court jury has found the defendant, Richard R. Lussier (Lussier), guilty of a charge of driving to endanger, death resulting. The record evidence indicates that on July 9, 1983, at approximately 5:30 p.m. in the city of Woonsocket, Dorothy Bebe, who was operating her motor vehicle, was about to turn left from Gaskill Street into State Street when her vehicle was struck by another motor vehicle operated by Lussier. Nobody disputes the fact that Dorothy Bebe died as a result of the collision.

The decedent's niece, who was a passenger in her aunt's car, testified that she observed Lussier's vehicle come "very fast" from the opposite direction and strike decedent's vehicle. The niece, who had been driving for some twenty years, estimated Lussier's speed at between sixty and seventy miles per hour. The area's posted speed limit is twenty-five miles an hour.

Medical personnel who attended to Lussier's needs both at the collision scene and at Fogarty Memorial Hospital testified concerning the strong odor of alcohol that emanated from Lussier and his vomit. The physician on duty at the hospital's emergency room ordered blood work so that he could estimate the amount of alcohol in Lussier's blood. The laboratory technician testified at trial that Lussier's blood-alcohol content was "0.177 percent."

In his appeal Lussier raises two issues: He challenges (1) the trial justice's denial of his motion to suppress the use of the hospital's records and (2) the charge to the jury.

The trial justice, in denying the motion to suppress,[1] ruled that the confidentiality of the Health Care Information Act was unconstitutional because G.L. 1956 (1976 Reenactment) § 5–37.3–6, as amended by P.L. 1978, ch. 297, § 1, which exempts confidential health-care information from compulsory legal process, represents an unjustified intrusion upon the separation of powers mandated by art. III of the Rhode Island Constitution.

---

1. It should be emphasized that the blood test ordered by the emergency-room physician was to evaluate Lussier's condition, a necessary step before sedating a person who is possibly intoxicated. There was no police involvement, no state action, and thus no Fourth Amendment concern.

The trial justice's actions foreshadowed similar actions taken by this court in *Bartlett v. Danti*, 503 A.2d 515, 517 (R.I. 1986), where this court expressed similar sentiments to those of the trial justice. Lussier now concedes that this portion of his appeal is moot because of the ruling in *Bartlett*.

In his charge to the jury, the trial justice stressed that the jury could not return a guilty verdict unless it was convinced that Lussier had operated his vehicle in reckless disregard of the safety of others and that such recklessness was the proximate cause of Dorothy Bebe's demise. He observed:

"In determining recklessness, you may consider all of the conditions which existed at the time and place under consideration, and of the condition of the driver. You may consider the weather conditions, the road conditions, the time of day or night, whether the driver was intoxicated, and if so the degree of intoxication, the speed of the vehicle, or any other factors which you find to exist in this case which you determine bears upon the question of reckless operation. On the question of speed, the law provides a maximum speed of 25 miles per hour in a residential zone. On the question of intoxication, under our law intoxication is determined by blood alcohol concentration of one tenth of one percent; that's .10 percent or more by weight as shown by a chemical analysis of blood. * * * You heard evidence in this case, and it is in the documents, that the reading in this case was .177, which is above the limit of legal intoxication."

At the conclusion of the charge, Lussier's counsel objected to that portion of the charge "where the Court instructed the jury that a finding of .10 or above is proof of intoxication."

In taking this position, counsel appears to have overlooked the many changes effected by the Legislature since that body first enacted P.L. 1908, ch. 1592, § 13, which barred any motorist from driving a motor vehicle "when intoxicated, or in a race, or on a bet or wager, or for the purpose of making a record." In 1951 the Legislature adopted a comprehensive "Motor Vehicle Code," which contained among its many prohibitions one concerning driving while "under the influence of intoxicating liquor." Public Laws 1950, ch. 2595, art. XXIV, §§ 2(a) and (b). Later, the Legislature amended G.L. 1956 § 31–27–2, with the passage of P.L. 1959, ch. 101, § 1. The 1959 provision allowed for the admission into evidence of the chemical analysis of blood, breath, or urine as evidence of the amount of alcohol in a defendant's blood, provided that the defendant had consented to the test and there was "additional competent evidence" presented bearing on the issue of whether the defendant was in fact under the influence of intoxicating liquor. Subsequently, in 1966, Rhode Island, through its Legislature, adopted the implied-consent law that, in essence, provided that any person operating a motor vehicle within the state was deemed to have given his consent to a chemical test of his breath, blood, or urine. Public Laws 1966, ch. 215, § 1.

Incorporated within the new statute by § 31–27–2.1(c) were statutory presumptions. Depending upon the results of the tests, a person could be presumed not to be under the influence of liquor; or he or she could be presumed to be under the influence of liquor, but such presumption could not be employed unless there was other competent evidence relating to the intoxication issue or if the test indicated the presence of 0.10 percent or more by weight of alcohol in the person's blood, the presumption was unfettered by the necessity of presenting other competent evidence. Such presumptions, we said, were permissive and did not shift the burden of persuasion but might impose upon the defendant the burden of going forth with evidence if he or she so desired. *State ex rel. Thompson v. DeNardo*, 448 A.2d 739, 741 (R.I. 1982).

Time marched on, and in 1982 and 1983 §§ 31–27–2 and 31–27–2.1 were significant-

ly revised. In 1982 the offense of driving under the influence of intoxicating liquor was classified as a misdemeanor, and the requirement for additional competent evidence of intoxication beyond the chemical tests was deleted. *See* § 31–27–2(a), as amended by P.L. 1982, ch. 176, § 1. In 1983 the statutory presumptions were deleted from § 31–27–2.1 by the enactment of P.L. 1983, ch. 227, § 1, and a new subsection (b) was added to § 31–27–2. This subsection reads, "Any person charged under subsection (a) of this section whose blood alcohol concentration is one-tenth of 1% (.1%) or more by weight as shown by a chemical analysis of a blood, breath or urine sample shall be guilty of violating subsection (a) of this section. This provision shall not preclude a conviction based on other admissible evidence." Public Laws 1983, ch. 227, § 1.

The 1983 changes were statutory responses to the National Highway Safety Act of 1982, which authorized federal "grants to those States which adopt and implement effective programs to reduce traffic safety problems resulting from persons driving while under the influence of alcohol * * *." 23 U.S.C.A. § 408(a), added by P.L. 97–364, Title 1, § 101(a), Oct. 25, 1982. Section 408(e)(1) specifically conditions eligibility upon the state's enacting a provision identical to what is now our § 31–27–2(b).

In *Burg v. Municipal Court for the Santa Clara County Judicial District of Santa Clara County*, 35 Cal. 3d 257, 267, 673 P.2d 732, 738, 198 Cal. Rptr. 145, 150 (1983), the California Supreme Court observed that "[s]cientific evidence and sad experience demonstrate that any driver with 0.10 percent blood alcohol is a threat to the safety of the public and to himself." The court also noted the statement of Dr.

Roger P. Maickel made before the Subcommittee on Courts of the Senate Judiciary Committee when he remarked, "[T]ypically vision impairment begins at 0.03–0.08 percent blood alcohol and becomes significant in all subjects at 0.10 percent; reaction-time impairment begins at 0.04 percent; judgment of distance, dimensions and speed at 0.08 percent; coordination and memory at 0.10 percent." *Burg*, 35 Cal. 3d at 267, 673 P.2d at 738, 198 Cal. Rptr. at 150–51.[2] In *Burg* the court alluded to the California Driver's Handbook, a publication issued by that state's Department of Motor Vehicles, which admonished the readers that "[t]he average size person (160 pounds) can reach a .10 BAC [blood-alcohol content] with as few as three or four average drinks (or beers) in one hour."

Consequently, it is clear that because of the 1983 amendment, the issue is no longer whether a defendant was intoxicated or whether he or she was "under the influence of liquor" or whether someone's driving ability was impaired in any fashion. Presumptions have been discarded. The single, decisive issue is whether a motor vehicle is being operated by a driver whose blood-alcohol concentration equals or exceeds one-tenth of one percent. Once the record indicates one-tenth of one percent or more, the penal consequences will apply without regard to how the alcohol has affected the individual personally. The purpose of the statute is not to relieve the state of its burden to prove defendants guilty beyond a reasonable doubt or to shift the burden to the defendant. It simply removes the necessity of providing an expert at each trial to testify about the effect of that percentage of alcohol upon the defendant's ability to drive.

Here Lussier's objection to the charge was directed at the trial justice's refusal to

**2.** Other jurisdictions besides California have considered and rejected constitutional attacks on statutes similar to the one now before us. *See Van Brunt v. State,* 646 P.2d 872 (Alaska App. 1982); *Fuenning v. Superior Court,* 139 Ariz. 590, 680 P.2d 121 (1983); *Roberts v. State,* 329 So. 2d 296 (Fla. 1976); *People v. Ziltz,* 98 Ill. 2d 38, 74 Ill.Dec. 40, 455 N.E.2d 70 (1983); *State v. Tanner,* 15 Ohio St. 3d 1, 472 N.E.2d 689 (1984); *Commonwealth v. Mikulan,* 504 Pa. 244, 470 A.2d 1339 (1983); *State v. Franco,* 96 Wash. 2d 816, 639 P.2d 1320 (1982); *State v. Ball,* 164 W.Va. 588, 264 S.E.2d 844 (1980).

charge the jury that a guilty verdict could not be reached unless the jury was satisfied that Lussier had consented to the taking of his blood and/or the conditions set forth in § 31–27–2(c) relating to such matters as the mailing of a true copy of the test results and the use of equipment approved by the director of the Department of Health had been complied with. As noted earlier in this opinion, there was no arrest, and the records that were produced in court were the results of actions taken by hospital personnel rather than those taken under the supervision of some law-enforcement agency.[3] Consequently, Lussier gains nothing from this particular argument or from his complaint that the trial justice should have charged the jury that the test results only gave rise to a presumption.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.

---

**3.** This factor differentiates Lussier's plight from that of the defendant in *State v. Timms,* 505

A.2d 1132 (R.I. 1986).