STATE

v.

**Judith ENSEY.**

No. 2002–236–C.A.

Supreme Court of Rhode Island.

Sept. 1, 2005.

judgment with respect to the other allegedly    discriminatory acts.

Virginia M. McGinn, Providence, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

At the conclusion of a nonjury trial in the District Court, the defendant, Judith Ensey, was found guilty of driving under the influence (DUI) in contravention of G.L.1956 § 31–27–2 as amended by P.L.

1994, ch. 70, art. 35, § 7.[1] Defendant Ensey then appealed to the Superior Court, where the case was tried on a *de novo* basis before a jury. The jury convicted her on the DUI charge, and the trial justice in the Superior Court sentenced her to serve a one-year term of imprisonment, which sentence was suspended with probation. The defendant was also assessed a fine and court costs, and her license to drive was suspended for six months. In addition, she was ordered to perform fifty hours of community service and to attend "alcohol counseling" and "DWI school."

The defendant has appealed to this Court from her Superior Court conviction.[2] She contends that the trial justice erred by admitting into evidence the results of a breathalyzer test, because (she alleges) the prosecution failed to present sufficient evidence that the test was performed in accordance with the criteria set forth in § 31–27–2(c). The defendant further contends that the trial justice's jury instructions concerning the breathalyzer machine in effect constituted a directed verdict of guilt and also constituted an improper comment on the evidence that impermissibly shifted the burden of proof from the prosecution to the defense. In our judgment, the Superior Court trial was not tainted with reversible error, and we therefore affirm the judgment of conviction.

## Facts and Travel[3]

At defendant's jury trial, John Carroll[4] of the Central Falls Police Department testified that, at the time of defendant's arrest in 1998, he was working as a uniformed patrol officer assigned to the midnight–to–8 a.m. shift on the east side of the City of Central Falls. Officer Carroll testified that one of his duties as a patrol officer was to ensure that patrons of the local bars and restaurants would leave those establishments at closing time (1 a.m.) in a timely manner.

Shortly after 1 a.m. on May 9, 1998, while Officer Carroll was in the process of performing this duty, he was standing in the parking/breakdown lane of a street in Central Falls outside a restaurant called Benjamin's Bar & Grille. Officer Carroll testified that, while he was speaking with an unidentified male at that location, his attention was diverted from his conversation when he observed a vehicle, whose registration plate was LQ 512, traveling southbound on Broad Street at a rate of speed in excess of the speed limit of twenty-five miles an hour. Officer Carroll testified that the vehicle then swerved towards the parking/breakdown lane in the direction of two vehicles that were parked

1. The defendant had the right to a jury trial in the Superior Court in the first instance, but she chose to give up that right by signing a waiver form consenting to a nonjury trial in the District Court. Upon being found guilty by the District Court judge, she exercised her right to a *de novo* trial in the Superior Court.

2. The defendant filed her notice of appeal on February 14, 2002, five days before the judgment of conviction was actually entered. We do not regard defendant's premature appeal to be fatal, because we now have jurisdiction over the case. We shall treat the appeal as if it had been timely filed after judgment was entered. *See Russell v. Kalian,* 414 A.2d 462,

464 (R.I.1980) ("In the interests of justice and to avoid undue hardship, we do not regard this minor procedural defect as fatal.").

3. Additional facts will be supplied in the "Analysis" portion of this opinion as may be necessary to clarify our discussion of the various legal contentions.

4. John Carroll now holds the rank of detective in the Central Falls Police Department. At the time of defendant's arrest, however, he was a patrol officer, and in this opinion we shall refer to him as Officer Carroll.

directly in front of Benjamin's Bar & Grille. The driver of the speeding vehicle avoided the parked vehicles by swerving back towards the travel lane, but the driver then swerved back towards Officer Carroll, who had to jump "onto the sidewalk to avoid being hit."

While he was on the sidewalk, Officer Carroll observed his shift commander, Sergeant Bruce J. Ogni, driving by.[5] Officer Carroll testified that he contacted Sergeant Ogni by portable radio and told him that he had almost been struck by a vehicle whose registration plate was LQ 512. He requested that Sergeant Ogni pull the vehicle over.

Sergeant Ogni testified that he saw the subject vehicle within seconds after receiving Officer Carroll's request, and he immediately directed the driver of the vehicle to pull over to the side of the road. Sergeant Ogni further testified that Officer Carroll arrived at the scene "a second after" and that, while he (Sergeant Ogni) ensured that there were no traffic problems, Officer Carroll approached the driver of the vehicle.

Officer Carroll testified as follows concerning his observations at that point:

"As I approached the driver's side, the window was already down. I came to rest upon the doorjam area which is our standard tactic. At that point, I started a conversation with the operator and I immediately noted a very overwhelming smell of alcohol beverage coming from the person and the vehicle."

Officer Carroll identified defendant Judith Ensey to the jury as being the driver of the vehicle. He testified that, as he was speaking with her, "she was mumbling."

He also testified that he noticed that "her face was very flushed, very red." He then testified that, while complying with his request that she exit the vehicle, defendant "almost fell into the lane of travel." According to Officer Carroll, defendant Ensey "then had to grab the door, the operator's side door, to steady herself." Officer Carroll said that he "ushered her to the sidewalk area" and that he then "asked her to complete a set of field sobriety tests due to the fact that [he] had suspicions about her being under the influence." Those field sobriety tests were: the horizontal gaze nystagmus test, the "finger-to-nose" test, and the Rhomburg balance test.

Officer Carroll testified that, rather than touching her nose during the "finger-to-nose" test, defendant touched her left eye with her left finger and the middle of her forehead with her right finger.

Officer Carroll further testified that he then explained the Rhomburg balance test to defendant, telling her that she must stand with her feet together and hands down by her side, close her eyes, and lean her head back for thirty seconds. Officer Carroll also testified that, when defendant attempted to perform that test, she "was unstable * * * at that point and fell backwards into a chain-linked fence that was directly behind her."

After he saw defendant fall into the fence, Officer Carroll became concerned for her safety, and he immediately halted the field sobriety testing. He arrested defendant Ensey for suspicion of driving under the influence of liquor or drugs. Officer Carroll testified that he advised defendant of her rights and then transported her to the police station for processing.[6]

---

5. Bruce J. Ogni now holds the rank of lieutenant in the Central Falls Police Department. At the time of defendant's arrest, however, he was a sergeant, and in this opinion we shall refer to him as Sergeant Ogni.

6. Officer Carroll testified that he read defendant certain statements contained on a lami-

At the Central Falls police station, Officer Carroll read defendant the words printed on a form entitled "RIGHTS FOR USE AT STATION."[7] The defendant waived her rights by initialing each paragraph on the form and by signing the bottom of the form to acknowledge that she had been read her rights. Her signature also indicated her agreement to submit to a chemical test.[8] The defendant did not seek to take advantage of her right to make a telephone call.

Officer Carroll testified that, employing an "Intoxilyzer 5000" machine, he administered a breathalyzer test to defendant in order to determine her blood-alcohol concentration (BAC).[9] He further testified that the breathalyzer test consisted of two phases separated by a minimum of thirty minutes; he added that, before administering the test to defendant, he observed her for fifteen minutes to ensure that she did not ingest anything or act in any other way that could have had an adverse effect on the results.

Officer Carroll testified that he administered the first phase of the breathalyzer test at 1:44 a.m. The first phase resulted in a BAC reading of 0.161 percent. Officer Carroll administered the second phase of the breathalyzer test approximately thirty four minutes later. The second phase of the breathalyzer test resulted in a BAC reading of 0.145 percent.[10]

Officer Carroll proceeded to issue to defendant a written notification of the alleged offense (a "ticket"), charging her with the offense of driving under the influence of alcohol or drugs in violation of § 31–27–2.[11] It is from her conviction by the Superior Court jury on that charge that defendant now appeals.

The defendant raises two issues on appeal. She first contends that the results of

nated card. (See generally *In re Kean*, 520 A.2d 1271, 1272 n. 1 (R.I.1987).) The statements on the card included the standard *Miranda* warnings as well as the following statement about the right to be examined by a physician of one's choice:

> "You have the right to be examined at your own expense immediately by a physician selected by you. You will be afforded a reasonable opportunity to exercise this right."

7. The "RIGHTS FOR USE AT STATION" form contained language advising defendant that she was suspected of having driven under the influence of intoxicating liquor and/or drugs and requesting that she submit to a chemical test. The form also incorporated *Miranda* warnings and set forth defendant's rights and the statutory penalties for refusal to submit to a chemical test.

8. The defendant did not object to, nor does she challenge on appeal, the admission into evidence of the initialed and signed "RIGHTS FOR USE AT STATION" form, in which she agreed to submit to a chemical test.

9. In *State v. Cluley*, 808 A.2d 1098, 1101 n. 1 (R.I.2002), we explained the scientific under-

pinning of blood-alcohol concentration (BAC) tests by quoting at length from a discussion of the subject in a scholarly treatise.

10. At the time of defendant's arrest, a person could be found guilty of driving under the influence (DUI) of liquor or drugs if his or her BAC was one-tenth of one percent (0.10%) or more by weight as shown by a chemical analysis of a sample of his or her blood, breath, or urine. G.L.1956 § 31–27–2(b)(1). That provision has since been amended so that a person may be found guilty of a DUI offense if his or her BAC reading is eight one-hundredths of one percent (0.08%) or more by weight.

11. Section 31–27–2(a), which has since been amended, provided at the pertinent time:

> "Whoever operates or otherwise drives any vehicle in the state while under the influence of any intoxicating liquor, drugs, toluene, or any controlled substance as defined in chapter 28 of title 21, or any combination thereof, shall be guilty of a misdemeanor and shall be punished as provided in subsection (d) of this section."

the breathalyzer test were inadmissible because the prosecution failed to provide adequate evidence that the solution used to test the accuracy of the "Intoxilyzer 5000" breathalyzer machine was properly constituted; and, further developing that contention, defendant argues that, because the prosecution had allegedly failed to lay the proper evidentiary foundation, the trial justice erred in admitting the breathalyzer test results. The defendant's second appellate contention deals with the instructions to the jury in her case. She argues that the trial justice improperly instructed the jury about the breathalyzer test results and that those instructions in effect directed a verdict in favor of the prosecution and impermissibly shifted the burden of proof from the prosecution to the defense.

### Analysis

### I

### The Admissibility of the Breathalyzer Test Results.

#### A. General Principles

At the time defendant was arrested, § 31–27–2(b)(1) provided in pertinent part:

"Any person charged under subsection (a) of this section whose blood alcohol concentration is one-tenth of one percent (.1%) or more by weight as shown by a chemical analysis of a blood, breath, or urine sample shall be guilty of violating subsection (a) of this section. This provision shall not preclude a conviction based on other admissible evidence. Proof of guilt under this section may also be based on evidence that the person charged was under the influence of intoxicating liquor * * * to a degree

which rendered such person incapable of safely operating a vehicle."

In *State v. Lusi*, 625 A.2d 1350 (R.I. 1993), we specifically commented upon the importance of the chemical analysis provisions of § 31–27–2(b) as a means of assisting law enforcement in its combat against drunk driving. We stated in that case: "With the enactment of § 31–27–2, as amended by P.L. 1983, ch. 227, § 1 [subsection (b)(1)], the Legislature expressed a clear intent to rely on breathalyzer-test results whenever possible." *Lusi*, 625 A.2d at 1354.

Several years earlier, in the case of *State v. Lussier*, 511 A.2d 958 (R.I.1986), we had similarly addressed the purpose of the statutory focus on blood-alcohol concentration. We stated:

"The single, decisive issue is whether a motor vehicle is being operated by a driver whose blood-alcohol concentration equals or exceeds one-tenth of one percent. Once the record indicates one-tenth of one percent or more, the penal consequences will apply without regard to how the alcohol has affected the individual personally. The purpose of the statute is not to relieve the state of its burden to prove defendants guilty beyond a reasonable doubt or to shift the burden to the defendant. It simply removes the necessity of providing an expert at each trial to testify about the effect of that percentage of alcohol upon the defendant's ability to drive." *Id.* at 960.[12]

Before the results of a chemical analysis may be admitted, however, the prosecution must satisfy the foundational require-

---

12. In our opinion in *State v. Lusi*, 625 A.2d 1350, 1354 (R.I.1993), we characterized the language in *Lussier* that is quoted in the text as being a recognition of "the validity of the breathalyzer test as a reliable, objective method of proof to establish guilt and [as also being an upholding of] the state's right to rely primarily on the results of that test in prosecuting a defendant under § 31–27–2."

ments that are set forth in § 31–27–2(c).[13] Many other jurisdictions have similarly addressed the need for foundational evidence in this context. *See, e.g., State v. Remsburg,* 126 Idaho 338, 882 P.2d 993, 994 (Ct.App.1994) ("Compliance with the requisite standards and methods for administration of the Intoximeter test is a foundational prerequisite to having the test results admitted into evidence."); *State v. Bradley,* 120 Idaho 566, 817 P.2d 1090, 1092 (Ct.App.1991) ("Compliance with the requisite standards and methods is a foundational prerequisite to having the test results admitted into evidence."); *State v. Kudlacek,* 229 Neb. 297, 426 N.W.2d 289, 292 (1988) ("Reasonable proof that the Intoxilyzer machine was accurate and functioning properly is all that is required as foundation evidence."); *see also People v. Dailey,* 173 Misc.2d 431, 661 N.Y.S.2d 512, 512 (N.Y.Co.Ct.1997) ("It is now well settled that the breathalyzer is a scientifically reliable instrument which, assuming certain conditions are met, is capable of producing an accurate measurement of a suspect's blood alcohol content.").

The determination of whether the prosecution has satisfied the foundational prerequisites established by § 31–27–2(c) is governed by the provisions of Rule 104(a) of the Rhode Island Rules of Evidence. Rule 104 provides in pertinent part as follows:

"(a) *Questions of Admissibility Generally.* Preliminary questions concerning * * * the admissibility of evidence shall be determined by the court subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence * * *.

"(b) *Relevancy Conditioned on Fact.* When the relevancy of evidence depends upon the fulfillment of a condition of

**13.** At the pertinent time § 31–27–2(c) provided:

"In any criminal prosecution for a violation of subsection (a) of this section, evidence as to the amount of intoxicating liquor, * * * in the defendant's blood at the time alleged as shown by a chemical analysis of the defendant's breath, blood, or urine or other bodily substance shall be admissible and competent, provided that evidence is presented that the following conditions have been complied with:

"(1) The defendant has consented to the taking of the test upon which the analysis is made. Evidence that the defendant had refused to submit to the test shall not be admissible unless the defendant elects to testify.

"(2) A true copy of the report of the test result was mailed within seventy-two (72) hours of the taking of the test to the person submitting to a breath test.

"(3) Any person submitting to a chemical test of blood, urine, or other body fluids shall have a true copy of the report of the test result mailed to him or her within thirty (30) days following the taking of the test.

"(4) The test was performed according to methods and with equipment approved by the director of the department of health of the state of Rhode Island and by an authorized individual.

"(5) Equipment used for the conduct of the tests by means of breath analysis had been tested for accuracy within thirty (30) days preceding the test by personnel qualified as hereinbefore provided, and breathalyzer operators shall be qualified and certified by the department of health within three hundred sixty-five (365) days of the test.

"(6) The person arrested and charged with operating a motor vehicle while under the influence of intoxicating liquor, * * * in violation of subsection (a) of this section was afforded the opportunity to have an additional chemical test and the officer arresting or so charging the person informed the person of this right and afforded him or her a reasonable opportunity to exercise the same, and a notation to this effect is made in the official records of the case in the police department. Refusal to permit an additional chemical test shall render incompetent and inadmissible in evidence the original report."

fact, the court shall admit it upon the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

■ In *Bourdon's, Inc. v. Ecin Industries, Inc.*, 704 A.2d 747 (R.I.1997), we emphasized the discretion accorded to trial justices with respect to evidentiary rulings:

"It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.' * * * We have held that this standard is applicable to a trial justice's determinations with respect to both the relevancy of proffered evidence and the adequacy of the foundation laid for its admission." *Id.* at 758 (quoting *Soares v. Nationwide Mut. Fire Insurance Co.*, 692 A.2d 701, 701–02 (R.I.1997) (mem.)); *see also Malinowski v. United Parcel Service, Inc.*, 792 A.2d 50, 53 (R.I.2002).[14]

■ Once a trial justice determines that particular breathalyzer test results are admissible and those results are admitted, a defendant may offer competent evidence to rebut the inference that the test result was accurate. *See Lusi*, 625 A.2d at 1355 ("With respect to the question of whether a defendant may offer evidence to rebut the inference that a BAC at the time of the testing was as great at the time of actual driving, * * * once the inference is drawn, competent evidence may be offered in rebuttal."); *see also State v. Sensing*, 843 S.W.2d 412, 416 (Tenn.1992) ("The breath test result merely creates a rebuttable presumption of intoxication.").[15]

With these principles in mind, we must now determine whether the trial justice abused her discretion in finding that the prosecution laid an adequate foundation for the admission of the breathalyzer test results.

### B. Certification of the Breathalyzer Machine.

■ The defendant filed a pretrial motion to suppress the results of the breathalyzer test. The state responded by filing a motion *in limine* to determine the admissibility of the breath test evidence. The trial justice conducted a pretrial hearing and, at the conclusion of that hearing, she ruled that the results were admissible for purposes of the hearing on the motion *in limine*.

The defendant asserts that the trial justice erred in admitting the results of the breathalyzer test because (defendant alleges) the prosecution failed to comply with

---

**14.** We have repeatedly stated that evidentiary rulings as to the admissibility of evidence lie within the sound discretion of the trial justice; and, unless there is a clear and apparent abuse of discretion, this Court will not disturb the trial justice's decision. *See, e.g., State v. Grayhurst*, 852 A.2d 491, 504 (R.I.2004). Furthermore, absent a clear abuse of discretion, this Court will not disturb a trial justice's determination regarding the adequacy of the foundation laid for the admissibility of evidence. *See Bourdon's, Inc. v. Ecin Industries, Inc.*, 704 A.2d 747, 758 (R.I.1997).

**15.** The approach whereby there is a *rebuttable presumption* of intoxication when the breathalyzer test yields a result within the statutorily specified zone is consistent with our holding in *State v. Langella* 650 A.2d 478 (R.I.1994). In *Langella*, we rejected an argument by the defendant that, once a trial justice initially determines that the police complied with the foundational requirements of § 31-27-3, the issue of compliance should then be submitted to the jury. *Langella*, 650 A.2d at 479; *see also State v. Christmas*, 131 N.M. 591, 40 P.3d 1035, 1038 (Ct.App.2002) (holding that, once the prosecution had made a threshold showing that the breathalyzer machine was functioning properly, "any discrepancy in regard to the validity of Defendant's breathalyzer results went to the weight of the evidence to be considered by the jury.").

the foundational requirements that are set forth in § 31–27–2(c)(4) and § 31–27–2(c)(5).[16] Specifically, defendant contends that, in order to establish that the solution used to certify the "Intoxilyzer 5000" breathalyzer machine was properly constituted, the prosecution was required to present "testimony from the person who actually prepared the solution" and that the prosecution's failure to present such testimony requires reversal of her conviction and a remand to the Superior Court for a new trial.

The defendant cites *People v. Schneider*, 129 Misc.2d 674, 493 N.Y.S.2d 747, 750 (N.Y.CityCrim.Ct.1985) to support her contention about the need for testimony concerning the preparation of the solution used in the breathalyzer. That decision by a New York trial court is, however, readily distinguishable from the case at bar. In *Schneider*, the New York criminal court found that there was no foundation establishing that the solution at issue in that case had been properly prepared. The court specifically noted that "the officer who calibrated the breathalyzer [machine] did not know who prepared the solution, when it was prepared or how long it had been lying on the shelf at the Police Laboratory prior to its use." *Id.*[17] Accordingly, based upon the "unique facts" of that case, the New York court dismissed the charge of driving while intoxicated. The facts of the case at bar, however, are not even remotely similar to those in *Schneider*.

Section 31–27–2(c) provides that "evidence as to the amount of intoxicating liquor * * * in the defendant's blood at the time alleged as shown by a chemical analysis of the defendant's breath, blood, or urine or other bodily substance shall be *admissible* and competent, provided that evidence is presented that the [foundational requirements] have been complied with * * *." (Emphasis added.)[18]

In the present case, Officer Carroll testified at the pretrial hearing that, at the time of defendant Ensey's arrest, he was trained and state-certified in the use of the "Intoxilyzer 5000" breathalyzer machine. He further testified that the particular breathalyzer machine that he used to administer the test was also certified by the state and that the certification was current. He then testified that, before he administered the test, he tested the machine to see if it was functioning properly; he did so by pressing a button on the machine so that it could perform a set of internal checks. Officer Carroll further testified that he ascertained that the machine was functioning properly and that, in administering the test to defendant Ensey, he followed all of the steps set forth in a document called the "Intoxilyzer 5000 Operational Procedure Checklist."[19] He tes-

16. The pertinent portions of the statute are set forth in note 13, *supra*.

17. In connection with the testimony of the police officer that is quoted in text, the New York court in *Schneider* noted that the officer had also "candidly conceded that alcohol tends to evaporate over a course of time and, if that occurred, it would affect the chemical balance of the reference solution, thus ultimately affecting the calibration of the breathalyzer." *People v. Schneider*, 129 Misc.2d 674, 493 N.Y.S.2d 747, 750 (N.Y.City-Crim.Ct.1985).

18. The foundational requirements at issue in this case are set forth in §§ 31–27–2(c)(4) and (5). *See* supra, note 13.

19. The "Intoxilyzer 5000 Operational Procedure Checklist" requires a police officer to follow and check off ten steps for phase one of the test and to repeat four of those steps for phase two of the test. The first three steps of phase one require the officer to observe the suspect for at least fifteen minutes before administering the test "to prevent oral intake of any material," to switch on the machine and to wait for the machine to warm up. Step

tified that he administered the test to defendant in the following way:

"That evening I inserted a mouthpiece to the Intoxilyzer 5000. I inserted an Intoxilyzer result card into the machine. The machine then goes through a series of internal checks. At that point, I told Ms. Ensey to blow into the machine until the sounding tone stops. And Ms. Ensey did complete that."

Officer Carroll identified the printout cards containing the results of both phases of the test, and the cards were admitted into evidence as full exhibits.

After Officer Carroll concluded his pretrial testimony, a supervisor of the breath analysis program at the Rhode Island Department of Health, Paula A. Gruttadauria, took the stand to testify for the prosecution. She testified that it is her duty to: "train police officers in the use of breath analysis equipment and [to] certify breath analysis equipment on a monthly basis." Ms. Gruttadauria testified that those duties are prescribed by the Rhode Island Department of Health's "rules and regulations pertaining to breath and blood test" and that she was familiar with those rules and regulations. She further testified that she had received her training and certification on the use of the "Intoxilyzer 5000" breathalyzer machine at the manufacturer's plant in Kentucky and that her certification was current as of the time relevant to this case.

At the pertinent time, Section 7.0 D. 1 of the Rules and Regulations of the Department of Health provided:

"An authorized agent of the Department will check on the accuracy of approved breath-testing instruments as prescribed by law. Instruments must indicate the same alcohol percent as the standard alcohol solution used in the test. Records of recertification dates will be maintained by said Department."

Section 7.0 D. 3 provided:

"All standard alcohol solutions used for equilibration or simulation tests will be prepared by forensic scientist or toxicologists within the Forensic Unit, Division of Laboratories of the Department."

The prosecution asked Ms. Gruttadauria "How often are [breathalyzer] machines certified?" She responded to the question by testifying: "Within 30 days."[20] She then provided additional testimony as to how the test is actually carried out:

"We use an instrument called a simulator. A simulator is filled with an alcohol solution. The alcohol solution is a .10 solution. The simulator has to be heated up to a certain temperature, and when it reaches that temperature, we run the vapor from the simulator solution into the instrument. The instrument should read .10 with an error factor of .005. So when we run the test every—within 30 days. Our results should be anywhere .095 to .105. Pro-

---

four instructs the officer to "Insert a new mouthpiece in end of BREATH TUBE, and push START TEST BUTTON." Step five informs the officer that "INSERT CARD will flash on display." Step six directs the officer to "Insert EVIDENCE CARD into card slot. Card must be FACE UP." Step seven instructs the officer that: "When display reads PLEASE BLOW, have subject blow into mouthpiece until tone stops." The next step, step eight, tells the officer that: "After analysis and printing, remove EVIDENCE CARD."

Check for internal standards on evidence card. Step nine directs the officer to: "Wait 30 MINUTES, after first breath sample." Finally, step ten instructs the officer to: "REPEAT STEPS 4 THROUGH 8 of Phase 2."

20. Section 31–27–2(c)(5) requires that:

"Equipment used for the conduct of the tests by means of breath analysis had been tested for accuracy within thirty (30) days preceding the test by personnel qualified as hereinbefore provided * * *."

viding that is so, we date the certification form with the time the test was performed, the signature of the inspector that did it and the solution that was used in the simulator."

Ms. Gruttadauria further testified that she tested and certified the "Intoxilyzer 5000" breathalyzer machine at the Central Falls Police Station on April 15, 1998, using a solution that had been prepared in the drug chemistry laboratory within the forensics section in the Department of Health.[21] Ms. Gruttadauria stated that, at the time the solution was prepared, the Department of Health's drug chemistry laboratory employed three people, including the laboratory's supervisor. She then testified that: "once the drug chemistry laboratory makes the solution, it is then tested by the toxicology laboratory again" and that the laboratory personnel then "provide me with a bottle with all the information on it as far as date prepared * * *."[22] She added that she then stored the bottle in a locked cabinet in her office.

At the pretrial hearing, the trial justice ruled that the results of the breathalyzer test were admissible subject to defense counsel's right to challenge, in a legitimate manner, the evidence during the trial. The trial justice specifically stated:

"[T]he defense has invited the Court to engage in a good deal of speculation about the accuracy of the test, the validity of the results and the validity of the science behind the machine and how it works. The file does not reflect any discovery requests that would suggest defendant is legitimately prepared to challenge the scientific validity of the

results or the machine and the science behind the machine.

"Just understand, counsel, that when we start this trial I'm going to be very careful to make sure that the jury is not invited to speculate about those issues. If you wish to challenge, legitimately challenge the science behind the machine and the scientific validity of the test results, you may certainly do that. You will do that if we come to the point and after we come to the point when the breathalyzer results come into evidence."

In further response to defense counsel's assertion that the prosecution had failed to satisfy the requirements set forth in § 31–27–2(c), the trial justice made the following findings:

"I've searched the statute and in particular the subsection. The conditions for admissibility are plain and simple and do not require that the State demonstrate more than very basic foundational requirements. The Defendant suggests that the Legislative intent must be to prove every item necessary to assure an accurate result, including the makeup of the simulator solution. There is nothing in the statute to suggest that that was the legislative intent. In fact, the statute suggests the opposite. The statute establishes a very low threshold for admissibility that is reflecting an intent to facilitate the admission of the test results and leaving it to the Defendant to attack the reliability of the results through cross-examination or the presentation of evidence. Furthermore, the defendant has not provided the Court with any information tending

21. The serial number on the machine that Ms. Gruttadauria tested and certified matched the serial number of the machine that Officer Carroll used to administer the breath test to defendant Ensey.

22. Ms. Gruttadauria also testified that, once a person prepared the solution, the same person would then mark the bottle with a six-month expiration date.

to rebut the presumption of reliability inherent to the statutory conditions * * * This Defendant remains free to cross-examine the State's witnesses concerning the reliability of the test results. She also remains free to present evidence assuming that she has complied with all the discovery requirements."

The trial justice then ruled that the results of the breathalyzer test would be admissible as evidence.[23]

During the actual trial, defense counsel again objected to the admissibility of the breath test results, asserting that the jury should also be allowed to determine whether the prosecution had complied with all of the requirements set forth in § 31–27–2(c). The trial justice disagreed with defense counsel's contention in that regard and admitted the results of the breathalyzer test. The defendant did not thereafter introduce any competent evidence to rebut the rebuttable presumption that the breath test results were accurate.

After reviewing the record in light of the above-outlined principles of law, we conclude that the evidence presented by the prosecution was sufficient to satisfy the foundational requirements established by § 31–27–2(c)(4) and (5). The trial justice certainly did not abuse her discretion in ruling that the prosecution had satisfied those foundational requirements,[24] and we note once again that the defense offered no genuine evidence to rebut the prosecution's evidence concerning the foundational requirements.

## II

### The Jury Instructions

■ The defendant asserts that the trial justice in the Superior Court improperly instructed the jury with respect to how it should consider the results of the breathalyzer machine. She contends that, by giving the challenged instructions, the trial justice in effect directed a verdict in favor of the state. She further maintains that the instructions constituted an improper comment on the evidence and thereby impermissibly shifted the burden of proof from the prosecution to the defense.[25] The state counters that the trial justice gave the challenged instructions to "rectify the erroneous and misleading contentions made during defendant's closing that the State had the burden of proving the science behind the breath machine before she could be convicted."

It is noteworthy that during the course of his closing argument defense counsel challenged the accuracy of the results of the chemical analysis of the samples of defendant's breath. He then challenged the jury to consider whether the breathalyzer machine had functioned properly on

---

23. Because of the rather unusual procedural posture of this aspect of this case, it may be helpful to quote the following language from the trial justice's ruling:

"I'm going to grant what is essentially the State's Motion in Limine and deny the Defendant's Motion in Limine. That Motion in Limine is folded into the Motion to Suppress."

24. *See* Rule 104 of the Rhode Island Rules of Evidence; *see also Bourdon's, Inc.,* 704 A.2d at 758.

25. It should be borne in mind that the justices of the Superior Court have the right, pursuant to an express statutory provision, G.L.1956 § 8–2–38, to "sum up the evidence * * * to the jury." The statute provides as follows:

"In every case, civil and criminal, tried in the superior court with a jury, the justice presiding shall instruct the jury in the law relating to the action, and may sum up the evidence therein to the jury whenever he or she may deem it advisable so to do; but any material misstatement of the testimony by him or her may be excepted to by the party aggrieved." *Id.*

the night that defendant was arrested when there was no evidence before the jury to demonstrate how the machine was programmed.[26]

The trial justice properly instructed the jury concerning the prosecution's burden as follows:

"Now, the State may prove that the defendant is guilty of this crime by one or two of the following methods: The State may prove that the defendant submitted to a chemical test of her breath and that the test revealed the defendant's blood alcohol level to be .10 percent or more by weight. Or, the State may prove by other evidence, direct or circumstantial, that the defendant was under the influence of intoxicating drugs or alcohol to a degree that rendered her incapable of safely operating her motor vehicle. In other words, the State may prove defendant's guilt by evidence of the surrounding facts and circumstances other than the chemical breath test and including the facts and circumstances relating to the defendant's conduct.

"Let's start—let's back up and start with that first method by which the State may prove the defendant's guilt. If you find beyond a reasonable doubt that the defendant's blood alcohol concentration was .10, that is, one-tenth of one percent or more by weight as shown by the chemical analysis of her breath, then it is your duty to return a verdict of

---

**26.** The actual language used by defense counsel in his closing argument should be considered. Specifically, defense counsel argued:

"The framers of the constitution never intended for anyone to be convicted on blind faith.

"Well, that's what the State wants you to do. They want you to believe that because a machine, a computer, a black box, comes out with readings over .10, that Judith Ensey must be guilty. They want you to have blind faith in the machine. They want to introduce the printouts. The State wants to introduce the printouts to you. The State wants you to look at them and say 'See, this printout, this says guilty.' That's your job. You need to be convinced beyond a reasonable doubt."

Defense counsel further argued:

"Well, the machine says .10, but the State hasn't introduced any evidence as to how this machine works. It sounds like a complicated machine. We have heard evidence that there is a computer involved. We've heard testified [sic] that the machine has some kind of self-testing diagnostic system in it, but the police officer wasn't able to testify about how that works. Well, what happens if there's something wrong with that self-testing diagnostics?

"Those of you who know about computers—I'm sure there's a few of us. I'm sure we've heard the expression 'Garbage in, garbage out.' If you program the computer with the wrong information, then you're not going to get the correct results. And, in this case, the State has to prove their case beyond a reasonable doubt. And, they haven't shown how this computer, this machine, this black box, how it was programmed * * *."

Defense counsel then argued:

"The State has the burden of proof and they haven't even shown you what the machine looks like. They haven't brought the machine in. * * * They haven't had someone on the stand to testify how the machine works, here are the parameters, here's what it does. Blind faith.

"* * *

"The State wants you to believe the breathalyzer machine, the computer, the black box. The State wants you to believe that it's infallible, that it doesn't make any mistakes. Well, if that machine is wrong, then there's certainly reasonable doubt about whether she was intoxicated to a degree that she can't drive safely."

Later in his closing argument, defense counsel questioned the validity of the breathalyzer test by comparing that technique with that of a blood test. In particular, he argued:

"They gave her a breath test. They didn't give her a blood test. The State wants you to convict based on her blood alcohol being .10 or higher. Well, common sense is the best way to prove that is not by some machine. The best way to prove that is by a blood test. It's common sense."

guilty. Once the evidence establishes that the defendant's blood alcohol level was .10 or more, she's guilty of the crime regardless of how the alcohol affected her."

The trial justice then gave the following cautionary instructions in response to the unsupported and improper comments made by defense counsel during his closing argument:

"Let me caution you about one more thing. It's been suggested to you that you should find the defendant not guilty because the State has failed to come forward with evidence to prove the scientific validity and reliability of the Intoxilyzer 5000 used to perform the chemical analysis of the defendant's breath and to determine her blood alcohol level. You've been invited to speculate that the machine or its programs are not reliable or scientifically valid, and you've been invited to speculate that a blood test is a more reliable indicator of a person's blood alcohol level, that the Intoxilyzer 5000 is not capable of accurately measuring a person's blood alcohol levels. Proof of the scientific validity and reliability of the Intoxilyzer 5000 is not an element of the crime with which the defendant has been charged and the State is not required to present evidence of that. As you know, it's my job to determine what evidence is properly put before the jury. *I have determined that the results of the chemical breath analysis should be admitted into evidence in this case for your consideration. Because of that, you are to consider those results in determining the guilt or innocence of the defendant.* You may assume that the chemical breath analysis made through the use of the Intoxilyzer 5000 machine is scientifically valid and reliable. You may assume that the use of the Intoxilyzer 5000 is a legitimate method of determining blood alcohol levels.

"Furthermore, there's no evidence in this case that this particular machine was not working properly on the day in question. You are entitled to assume, therefore, that it was. If you were to conclude that it was not, you would only be speculating about something you know nothing about and have no evidence about.

"Finally, I would caution you that the law does not require the defendant's guilt or innocence to be proved through the use of a blood test. You should not speculate about whether a blood test would have produced a more or less accurate result under the circumstances of this case." (Emphasis added.)

After the trial justice had finished instructing the jury, defense counsel vigorously objected to the instruction concerning the breathalyzer, and he requested a curative instruction.[27] The trial justice denied the request.[28]

---

27. Defense counsel voiced some doubt as to whether a curative instruction would be efficacious. He summarized his lengthy objection to the jury instructions as follows:

"And for those reasons, I would object, and I'm not sure if it can be cured by an instruction. If it could, the instruction would be something to the effect that, 'You are the sole determiners of the fact.' I would ask the Court to instruct the jury that, 'You are in fact to determine that you have to be convinced beyond a reasonable doubt that this machine is in fact scientifically valid, that it does work; that if you have a reasonable doubt about that, that you're to find that you can disregard the breathalyzer results.'"

28. Defense counsel then moved for a mistrial as follows:

"Judge, I would move for a mistrial based on the fact that I feel you have instructed, in essence, for the jury to find my client guilty. Your instruction was to as-

■ A trial justice's jury instructions will be affirmed when the instructions adequately cover the law and, when viewed as a whole from the perspective of a jury that is composed of ordinary, intelligent lay people, the instructions do not reduce or shift the state's burden of proof. *State v. Keiser,* 796 A.2d 471, 472 (R.I.2002) (mem.) ("We have regularly held that we shall affirm a trial justice's jury instructions when, examined in their entirety from the perspective of a jury of ordinary intelligent lay people, the instructions adequately cover the law and neither reduce nor shift the state's burden of proof."); *see also State v. Grayhurst,* 852 A.2d 491, 517 (R.I.2004).

■ Although there is no established rule for remedying improper comments made during closing arguments, a cautionary instruction to the jury certainly is an appropriate remedial measure. *See State v. Boillard,* 789 A.2d 881, 883 (R.I.2002) ("Our cases have not established a clear, bright-line rule by which trial justices can determine whether remarks by counsel during closing arguments are improper, and if they are, what remedy is required.").[29]

Before the actual beginning of the trial, the trial justice had informed defense counsel that, although the results of the breathalyzer test administered to defen-dant were admissible, defendant could certainly challenge the scientific validity and reliability of those results by legitimate means during the trial. She specifically admonished defense counsel, however, that: "[W]hen we start this trial I'm going to be very careful to make sure that the jury is not invited to speculate about those issues."

Despite being warned, defense counsel did precisely what he had been warned against. In his closing argument, defense counsel invited the jury to speculate about the validity and reliability of the breathalyzer machine without ever having presented any evidence to support that thesis during the trial itself. In reaction to what defense counsel had stated in his closing, the trial justice opted to give a cautionary instruction to the jury indicating that it should not engage in speculation.

The trial justice gave an instruction indicating that the jury had to find a blood-alcohol concentration of 0.10 before it could find defendant guilty. The key sentence from the instructions about that aspect of the jury's duty is the following:

"*If you find* beyond a reasonable doubt that the defendant's blood alcohol concentration was .10, that is, one-tenth of one percent or more by weight as shown by the chemical analysis of her breath,

sume that the result is accurate. That's tantamount to saying to the jury, 'Find my client guilty,' and therefore I would move for a mistrial."
The trial justice denied the motion for a mistrial, stating:
"I think what I instructed them was about the reliability and scientific validity of the Model 5000 Intoxilyzer. I don't think I instructed them that they had to accept these particular results."
In view of our decision to the effect that the instructions as given do not provide a basis for reversal, we see no abuse of discretion in the denial of the motion for a mistrial. *See State v. DePina,* 810 A.2d 768, 777 (R.I.2002)

("The denial of a motion to pass a case and declare a mistrial lies within the discretion of the trial justice and will be disturbed only if it is clearly wrong or if the trial justice has abused his or her discretion.").

29. Furthermore, it is well established that statements made during closing arguments do not constitute evidence. *See Bleau v. Wall,* 808 A.2d 637, 643 (R.I.2002) ("comments made in closing arguments are not evidence"); *see also DePina,* 810 A.2d at 777; *State v. Garcia,* 649 A.2d 1025, 1026 (R.I. 1994); *State v. Gaines,* 528 A.2d 305, 310 (R.I.1987).

then it is your duty to return a verdict of guilty." (Emphasis added.)

■ In a crucially important instruction, the trial justice proceeded to advise the jury as follows about its role:

"I have determined that the results of the chemical breath analysis should be admitted into evidence in this case *for your consideration.* Because of that, you are to *consider* those results in determining the guilt or innocence of the defendant." (Emphases added.) [30]

The trial justice continued with her instructions telling the jury that it could assume that "chemical breath analysis made through the use of the Intoxilyzer 5000 machine is scientifically valid and reliable * * * [and] that the use of the Intoxilyzer 5000 is a legitimate method of determining blood alcohol levels." The trial justice also warned the jury not to speculate about whether the particular machine that was used to administer the breathalyzer test to defendant had been functioning properly. She said:

"Furthermore, there's no evidence in this case that this particular machine was not working properly on the day in question. You are entitled to assume, therefore, that it was. If you were to conclude that it was not, you would only be speculating about something you know nothing about and have no evidence about."

We have previously upheld jury instructions that charged the jury that a BAC

---

30. We fully understand and respect the principle that it is improper for a judge to direct a verdict for the prosecution in a criminal case. *See Sullivan v. Louisiana,* 508 U.S. 275, 277, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) ("The right [to trial by jury] includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' "); *Carella v. California,* 491 U.S. 263, 265, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) ("Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases."); *United Brotherhood of Carpenters and Joiners of America v. United States,* 330 U.S. 395, 408, 67 S.Ct. 775, 91 L.Ed. 973 (1947) ("[A] judge may not direct a verdict of guilty no matter how conclusive the evidence."); *see also United States v. Gaudin,* 515 U.S. 506, 517, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 572–73, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977); *Sparf v. United States,* 156 U.S. 51, 105–06, 15 S.Ct. 273, 39 L.Ed. 343 (1895); *State v. Hazard,* 745 A.2d 748, 751 (R.I.2000).

But no such inappropriate judicial action took place in the case at bar; the trial justice in this case did not direct a verdict of guilty, but rather submitted the breathalyzer test results to the jury for its *consideration.*

In addition, it is noteworthy that, in the course of explaining the concept of "beyond a reasonable doubt" in her instructions to the jury, the trial justice said the following:

"If you become troubled with the concept, you might consider approaching it by asking yourselves these kinds of questions: And these are just examples of how you might approach it.

"Do I have some doubt about the certainty of the State's charges against the defendant? If the answer to that question is yes, then ask yourself, from where does my doubt come? What caused it? Is there something about the evidence that troubles me? Or is it a lack of evidence that troubles me? You should think about the state in which the evidence has left your mind. Is it a state of certainty? Do you have an abiding and lasting conviction in your mind that the elements of the charges have been proved? Or do you have doubt? Are your doubts something you conjured up on your own? Are your doubts something that came from the trial evidence? Were they caused by the trial evidence or lack of evidence? Considering the trial evidence that you believe, is your doubt rational? Is it appropriate considering the trial evidence?"

It is clear to us that this language conveyed to the jury in cogent terms the message that it was free to mull over the evidence before reaching a decision as to innocence or guilt.

finding of 0.10 percent or more was proof of intoxication. *Lussier,* 511 A.2d at 960 ("Once the record indicates one-tenth of one percent or more, the penal consequences will apply without regard to how the alcohol has affected the individual personally."); *see Lusi,* 625 A.2d at 1353 (specifically commenting on the validity of the jury instruction in *Lussier*); *see also Miller v. Rhode Island Hospital,* 625 A.2d 778, 781–82 n. 3 (R.I.1993) ("In Rhode Island a finding of 0.10 blood-alcohol content is definitive proof that a motorist is driving while intoxicated.").

We are satisfied that the jury instructions, when viewed in their entirety, did not reduce or shift the state's burden of proof.[31] We especially note the fact that, time and time again, the trial justice told the jury that its role was to *consider* the results of the chemical breath analysis; at no time was the jury told that it *had to* find the defendant criminally guilty. The trial justice's instructions properly informed the jury of the state's burden of proof, and her cautionary instruction properly told the jury to consider and weigh only the evidence that was before it and to refrain from speculating about matters that had not been entered into evidence and about which it had no knowledge.

Accordingly, we hold that the trial justice committed no reversible error in instructing the jury.

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The record may be returned to the Superior Court.

**31.** We are acutely aware of the principle that "[j]ury instructions relieving States of [the burden of proving beyond a reasonable doubt every element of the charged offense] violate a defendant's due process rights." *Carella v. California,* 491 U.S. 263, 265, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989); *see also State v. Hazard,* 745 A.2d 748, 751 (R.I.2000). No such violation occurred in this case.