STATE

v.

Jason PALMER.

No. 2006–226–C.A.

Supreme Court of Rhode Island.

Jan. 15, 2009.

Aaron L. Weisman, Providence, for Plaintiff.

Christopher Gontarz, Middletown, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

On May 10, 2005, a Providence County Superior Court jury returned a verdict finding the defendant, Jason Palmer, guilty of the following felonies: one count

of conspiracy to commit first-degree robbery, four counts of first-degree robbery, one count of attempted robbery, two counts of carrying a pistol without a license, five counts of committing a crime of violence while armed with a firearm, and three counts of assault with a dangerous weapon.

On appeal, defendant contends that the trial justice committed reversible error (1) with respect to his jury instruction concerning flight and (2) with respect to his ruling that defendant failed to make a *prima facie* showing of purposeful discrimination by the prosecution when it exercised one of its peremptory challenges during the jury selection process.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts [1] and Travel

### I

### The Robberies

On the evenings of June 4 and June 5, 2003, multiple armed robberies were committed at various retail establishments in the Providence area. When defendant was eventually tried in connection with those robberies, some two years later, numerous store clerks and other witnesses to the robberies were among those who testified for the prosecution. Two of the prosecution's witnesses were defendant's alleged accomplices, Mr. Anthony Perez (nicknamed "Blue") and Ms. Charisse Robles.

Mr. Perez testified at trial that the robberies committed on June 4 were committed by himself, by defendant, and by one Matthew Palmer (defendant's cousin). Mr. Perez testified that the robberies committed on June 5 were committed by the just-mentioned individuals and by one other accomplice, namely Charisse Robles (who also testified as to her involvement with the others in the June 5 robberies).

According to the testimony of Ms. Robles, after the June 5 robberies she went with Matthew Palmer, Mr. Perez, and defendant to defendant's apartment. Ms. Robles and Matthew Palmer later left the apartment and were arrested that same night.

Mr. Perez testified that, after a relative picked him up at defendant's apartment on the night of June 5, he observed Ms. Robles and Matthew Palmer being detained by the police.[2] Mr. Perez further testified that, after observing what was happening to Ms. Robles and Matthew Palmer, he went back to defendant's apartment, alerted him about the arrest of Ms. Robles and Matthew Palmer, and advised him to "leave." The witness further testified that, upon hearing what Mr. Perez had to say, defendant appeared to be "surprised" and "scared."

### II

### The Circumstances Surrounding Defendant's Arrest

The defendant was not arrested until July 26, 2003. Officer Thomas Zincone, Jr., one of the officers who arrested defendant, testified at trial that he was familiar with defendant and, at the time of defendant's arrest, had been looking for him for approximately "three to four weeks" because he was "wanted for several armed robberies which took place in Providence."

---

1. The facts set forth in this section were adduced from the testimony of the multiple witnesses who testified at defendant's second trial.

2. As for Mr. Perez, he was not apprehended until June 12, 2003. On that date he turned himself in to New York authorities, after having visited with family members in that state.

Officer Zincone further testified that, in the course of a patrol several days before defendant's arrest on July 26, he saw defendant walking on the sidewalk in the same general area where he was later arrested. He testified that on that occasion defendant made eye contact with the officers and then "ran into yards." Officer Zincone further testified that, after chasing defendant through several yards, both he and his partner, Officer Dennis O'Brien, were unable to find him.

Officer Zincone testified that, on the day of defendant's arrest (July 26), he and his partner were on patrol in the West End section of Providence. They were driving a black Crown Victoria, an unmarked police vehicle that Officer Zincone testified was "very well-known on the street." At approximately 11 p.m. that evening, while patrolling on Waverly Street in the West End, Officer Zincone and his partner approached a silver Cadillac that "was parked obstructing traffic in the street." Officer Zincone testified that he and his partner pulled their vehicle parallel to the Cadillac and that he shone his flashlight into the vehicle "because the operator still wasn't paying attention to us on the side of him." When the beam from the flashlight caused the operator of the Cadillac to pay attention to the police vehicle, Officer Zincone realized that the operator was defendant.

According to Officer Zincone's trial testimony, defendant then looked at the officer and "became very startled * * * and he frantically placed the vehicle into drive and attempted to [elude the officers] by taking off with his vehicle." Officer Zincone testi-

fied that, upon perceiving defendant's attempt to elude them, Officer O'Brien (who was driving the Crown Victoria) "pulled in front of [defendant] to prevent him from leaving the area." Officer Zincone further testified that, as he exited the police vehicle and approached defendant's vehicle on the passenger side, he noticed that the doors were locked and that the windows had been rolled up. Officer Zincone testified that, because defendant's vehicle was still moving in an attempt to "edge" away from the police car, he ordered defendant to stop his vehicle. The defendant's vehicle then stopped moving, and Officer O'Brien approached it from the driver's side. After encountering some resistance from defendant, Officer O'Brien removed him from his vehicle and placed him under arrest.

Officer Zincone further testified that, while he was bringing defendant to a marked police car, he said to the arrestee: "Jason, get in the car." According to Officer Zincone's trial testimony, defendant responded that his name was not Jason; Officer Zincone stated that he laughed at that point because he knew who defendant was.

## III

### The Trial

The defendant was indicted by a grand jury on thirty-four counts relating to the above-referenced series of robberies that took place on June 4–5, 2003.[3] On February 3, 2005, defendant's first jury trial ended in a mistrial as the result of a hung jury.[4]

3. Approximately half of the thirty-four counts with which defendant was originally charged were eventually dismissed by the Attorney General's Office.

4. During the *voir dire* process prior to the start of the first trial, the prosecutor asked the

potential jurors whether any of them, their family members, or close personal friends had ever been accused of a crime or had ever been arrested. A particular juror (an African American as is defendant) responded that her younger sister, with whom she was not close,

Thereafter, on May 2, 2005, defendant's second criminal jury trial on the remaining sixteen counts began. At the conclusion of the second trial, defendant was found guilty of the following felonies: one count of conspiracy, four counts of first-degree robbery, one count of attempted robbery, two counts of carrying a pistol without a license, five counts of committing a crime of violence while armed with a firearm, and three counts of assault with a dangerous weapon.

On July 21, 2005, defendant received the following sentences (all to run concurrently): (1) fifty years on each of the four first-degree robbery convictions, with thirty-five years to serve; (2) ten years suspended, with probation, on the conspiracy conviction; (3) five years on the attempted robbery conviction; (4) ten years on the conviction for carrying a pistol without a license; and (5) twenty years on the conviction for assault with a dangerous weapon. In addition, he was sentenced to a consecutive sentence of ten years on the conviction for committing crimes of violence while armed, which sentence was suspended, with probation.

A timely notice of appeal was filed on defendant's behalf. On appeal, defendant challenges the trial justice's instruction concerning flight and also the trial justice's handling of a defense objection to the prosecution's exercise of a peremptory challenge with respect to a particular juror.

## Standards of Review

### I

### The Standard Relevant to the Jury Instruction Issue

▇▇▇ In accordance with G.L.1956 § 8–2–38, a trial justice must "instruct the jury on the law to be applied to the issues raised by the parties." *State v. Lynch,* 770 A.2d 840, 846 (R.I.2001); *see also State v. Imbruglia,* 913 A.2d 1022, 1030 (R.I.2007). A trial justice's jury instructions will be upheld when the challenged instructions "adequately cover the law and, when viewed as a whole from the perspective of a jury that is composed of ordinary, intelligent lay people, the instructions do not reduce or shift the state's burden of proof." *State v. Ensey,* 881 A.2d 81, 95 (R.I.2005); *see also State v. Grayhurst,* 852 A.2d 491, 517 (R.I.2004); *State v. Keiser,* 796 A.2d 471, 472 (R.I.2002) (mem.).

▇▇▇ When this Court reviews jury instructions, the analytical process that we employ is *de novo. Imbruglia,* 913 A.2d at 1031; *see also State v. Graham,* 941 A.2d 848, 855 (R.I.2008). When jury instructions are challenged "this Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *State v. Kittell,* 847 A.2d 845, 849 (R.I. 2004) (internal quotation marks omitted); *see also State v. Cotty,* 899 A.2d 482, 497 (R.I.2006) ("In reviewing the appropriateness of a trial justice's jury instructions, this Court examines the instructions as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them.") (internal quotation marks omitted); *State v. Krushnowski,* 773 A.2d 243, 246 (R.I. 2001) ("[W]e review challenged portions of jury instructions in the context in which they were rendered.") (internal quotation marks omitted). Moreover, even if an instruction is erroneous, reversal is warrant-

had been incarcerated as a result of drug-related offenses within the past five years; but she added that this fact would not affect her ability to sit as a juror. It is noteworthy, as we will discuss at greater length hereinafter, that the prosecutor did *not* exercise a peremptory challenge with respect to this juror. *See* footnote 13, *infra.*

ed "only if a jury could have been misled to the prejudice of the complaining party." *Graham*, 941 A.2d at 855; *see also Hodges v. Brannon*, 707 A.2d 1225, 1228 (R.I. 1998); *Anter v. Ambeault*, 104 R.I. 496, 501, 245 A.2d 137, 139 (1968).

## II

### The Standard Relevant to the Peremptory Challenge Issue

▮ In determining whether a defendant has been denied his or her constitutional right to equal protection as a result of the prosecution's exercise of a peremptory challenge, the defendant must first establish a *prima facie* case of purposeful discrimination. *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also State v. Pona*, 926 A.2d 592, 601 (R.I.2007) (discussing *Batson* and its progeny).

▮ Once the defendant has made a *prima facie* showing of purposeful discrimination, the burden shifts to the prosecution to articulate a neutral, non-discriminatory reason for the challenge of the potential juror. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. The prosecution's race-neutral explanation for exercising a *peremptory* challenge "need not rise to the level justifying exercise of a *challenge for cause.*" *Id.* (emphasis added). In this context, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

▮ Finally, as the third step in the analysis mandated by *Batson*, the trial court then has "the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98,

106 S.Ct. 1712. In making this determination, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859. Since a trial justice's finding of purposeful discrimination "largely will turn on [an] evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

## Analysis
### I

### The Flight Instruction
#### A

### A Preliminary Issue

▮ In addition to his more particularized objection concerning the *wording* of the flight instruction (which objection we address hereinafter), defendant also contends on appeal that the trial justice committed reversible error by opting to give *any* flight instruction whatsoever. It is clear, however, that defendant has failed to preserve this issue for appellate review.

At trial, just prior to closing arguments, before the jury was brought down, there was a brief discussion between the attorneys and the trial justice concerning the content of the flight instruction. During this conversation, defense counsel indicated that he would "raise the exceptions after the charge" and that he "[did not] want a flight instruction at all." In response, the trial justice informed the attorneys that the proper time for objecting to jury instructions would be after he had read the instructions to the jurors. Defense counsel never again raised an objec-

tion to the giving of a flight instruction by the trial justice. After the trial justice instructed the jury, defense counsel's only objections were (1) to the inclusion in the flight instruction of the term "concealment" and the phrases "concealed himself" and "hides after the crime has been committed" and (2) to the trial justice's failure to include in his instruction certain language from this Court's opinion in *State v. Cooke*, 479 A.2d 727 (R.I.1984), regarding the relationship between the timing of flight and its probative value. Even though the trial justice had explicitly told counsel that objections to jury instructions should be lodged *after* the instructions were given, when that moment came, defense counsel made no objection to the more basic fact that the trial justice had chosen to give *any* instruction as to flight.

Rule 30 of the Superior Court Rules of Criminal Procedure requires a party who wishes to object to "any portion of the charge or omission therefrom" to distinctly state the matter to which the party objects and the grounds for that objection before the jury begins its deliberations.[5] *See Cotty*, 899 A.2d at 496. Further, as this Court stated in *State v. Crow*, 871 A.2d 930, 935 (R.I.2005):

> "The requirement in Rule 30 that the objection to an instruction be made before the jury retires (and that it be made with clarity and specificity) is crucial because, once alerted to the perceived error in the instruction that has been given, the trial justice has an opportunity to cure the alleged deficiencies

before the jury retires for deliberations."

In accordance with this Court's well-settled "raise-or-waive" rule, we do not ordinarily consider at the appellate level issues not properly presented before the trial court. *Grayhurst*, 852 A.2d at 518; *see also Vorgvongsa v. State*, 785 A.2d 542, 547 (R.I.2001); *State v. Figueroa*, 673 A.2d 1084, 1092 (R.I.1996); *State v. Burke*, 522 A.2d 725, 731 (R.I.1987).[6] Accordingly, since defendant voiced no objection to the giving of *any* flight instruction at the time when the trial justice expressly indicated objections should be made, we will not entertain his argument on that issue on appeal. In any event, as will become apparent from the following discussion, such an objection would have been unavailing.

## B

### The *Cooke* Inferences

The defendant also argues that the trial justice committed reversible error by giving the jury a flight instruction that allegedly imputed a consciousness of guilt to defendant. He argues that it was improper in this case for the jury instructions to permit the jury to employ "the chain of inferences" of guilt described in *Cooke*, 479 A.2d at 732–33. He contends that there was no occasion for that chain of inferences to be considered because he remained in the Providence area following the robberies and indeed was still in the Providence area when he was arrested ap-

---

**5.** We are aware that Rule 30 of the Superior Court Rules of Criminal Procedure does not explicitly mandate that objections to instructions be made *after* the instructions are given. Nevertheless, in the case at bar, the trial justice informed counsel in no uncertain terms that objections were to be made *after* he instructed the jury.

**6.** It is true that there is a narrow exception to our "raise-or-waive" rule where basic constitutional rights are concerned. *See State v. Bido*, 941 A.2d 822, 828–29 (R.I.2008); *State v. Texter*, 896 A.2d 40, 43 (R.I.2006); *State v. Russell*, 890 A.2d 453, 462 (R.I.2006); *State v. Gomez*, 848 A.2d 221, 237 (R.I.2004). However, the instant case does not fall within the parameters of that exception.

proximately a month and a half after the robberies.

■ It is well established in this jurisdiction that "relevant evidence of flight may be introduced as a circumstance bearing on the question of guilt that may be presented to the jury for consideration." *Cooke*, 479 A.2d at 732; *see In re Caldarone*, 115 R.I. 316, 326, 345 A.2d 871, 876 (1975).[7] In determining whether a flight instruction is appropriate in a particular case, this Court in *Cooke*, 479 A.2d at 732–33, expressly adopted the four-part "chain of inferences" approach that is set forth in *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977).[8] In adopting that approach, we held in *Cooke* that the probative value of flight as circumstantial evidence of guilt "depends on the degree of confidence with which [that four-part] chain of inferences can be followed * * *." *Cooke*, 479 A.2d at 732. Those inferences are (1) "something the defendant did led him [or her] to flee;" (2) defendant "fled out of consciousness of guilt;" (3) defendant's "consciousness of guilt derived from consciousness of guilt concerning the crime charged;" and (4) defendant's "consciousness of guilt concerning a crime charged reflects actual guilt of the crime charged." *Id.* at 732–33 (citing *Myers*, 550 F.2d at 1049). Since the third and fourth inferences are the most difficult to establish, this Court places "great reliance on the proximity in time of the flight to the crime charged in order to establish these inferences." *Cooke*, 479 A.2d at 733 (quoting *United States v. Howze*, 668 F.2d 322, 324–

25 (7th Cir.1982)); *see also Gomez*, 848 A.2d at 230.

■ The defendant challenges the applicability to his case of both the first and second *Cooke* inferences—*viz.*, (1) that something defendant did caused him to flee and (2) that defendant fled out of a consciousness of guilt. He argues that those *Cooke* inferences of flight as evidence of a consciousness of guilt are inapplicable in this case due to the fact that, even though Anthony Perez warned him about the arrest of Charisse Robles and Matthew Palmer on June 5, 2003 (the second night of the robberies), he remained in the area despite that warning until his arrest approximately a month and a half later.

We find this argument unpersuasive. Although it is true that defendant did not remove himself from the jurisdiction, he did, on more than one occasion, attempt to evade or elude law enforcement officers, which actions could fairly be viewed as "flight" (*i.e.*, evidence of a consciousness of guilt) for the purposes of the *Cooke* analysis. A reasonable jury could conclude that defendant fled from Officer Zincone by running "into yards" out of a consciousness of guilt. Similarly, a reasonable jury could conclude that defendant attempted to maneuver his vehicle so as to evade Officers Zincone and O'Brien on the night of his arrest out of a consciousness of guilt. Additionally, defendant's initial insistence to police that his name was not Jason could have been at least a partial basis for a reasonable jury to infer defendant's consciousness of guilt.[9] It was for the jury to

---

7. In words that are as accurate as they are terse, the Fifth Circuit has stated: "Analytically, flight is an admission by conduct." *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977).

8. It should be noted, however, that a valid flight instruction "need not cover or explicitly

articulate each link in the chain of inferences detailed in *Cooke*." *State v. Perry*, 725 A.2d 264, 267 (R.I.1999); *see also State v. Gomez*, 848 A.2d 221, 230 (R.I.2004).

9. *See generally United States v. Candelaria–Silva*, 162 F.3d 698, 705 (1st Cir.1998) ("Evidence of a defendant's flight and attempts to

draw conclusions about the motivation for these acts after it heard the evidence. *See Gomez,* 848 A.2d at 230–31. We perceive no error in the trial justice's giving a flight instruction that authorized the jury to employ "the chain of inferences" described in *Cooke.*

## C

### Concealment and Hiding

The defendant also challenges the trial justice's use of the term "concealment" and the phrases "concealed himself" and "hides after the crime has been committed" in the flight instruction that was given to the jury before its deliberations. He asserts that Rhode Island law refers to flight rather than concealment as being evidence of a consciousness of guilt; he contends that, because the flight instruction made reference to concealment, said instruction was fatally flawed and his conviction should be reversed.

"It is well settled that this Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *Kittell,* 847 A.2d at 849 (internal quotation marks omitted); *see also Cotty,* 899 A.2d at 497.

As we proceed to review the disputed language of the jury instruction, we set forth below what the trial justice actually said:

"A person who flees from the scene of a crime or hides after the crime has been committed may do so for a variety of reasons, not all of which are consistent with a consciousness of guilt. Flight or concealment does not create a presumption of guilt, and it would be improper for you to presume that the defendant is guilty simply because he fled or concealed himself. Flight might be motivated by factors entirely consistent with innocence.

"On the other hand, you may consider flight or concealment as a circumstance which does tend to indicate feelings of guilt, and these feelings may give rise to the inference that the feelings are evidence which tends to show actual guilt of the crime with which the defendant is charged.

"Before doing so, however, you should consider the following analysis. Ask yourselves: [First, did] the defendant do something that caused him to flee or conceal himself? [Second, did] the defendant flee out of consciousness of guilt, or was there some other reason for this action? [Third, if] there was a consciousness of guilt, did that consciousness of guilt arise out of the specific crime with which the defendant is charged? [Fourth, did] that consciousness of guilt reflect actual guilt of the crime charged?

"In considering these factors, it is important that you look at the time which had elapsed between the commission of the crime and the actions of the defendant in attempting to flee or conceal himself in determining whether or not the defendant's reason for fleeing or concealing was because of the commission of a crime. If you find evidence of flight or concealment, you should consider and weigh such evidence along with all the other evidence in this matter, and give it such weight as you think that it is fairly entitled to."

conceal or falsify identity may be presented at trial as probative of a guilty mind if there is an adequate factual predicate creating an inference of guilt of the crime charged."); 2

*McCormick on Evidence,* § 263 at 217 (6th ed. Broun 2006); 2 John H. Wigmore, *Evidence in Trials at Common Law,* § 276 at 122 (Chadbourn rev.1979).

Considering this instruction against the background of the evidence presented to the jury, as summarized in the Facts and Travel section of this opinion, we are untroubled by the fact that the instruction uses the language of concealment and hiding as well as that of flight. On the basis of the evidence before it, a reasonable jury could conclude that defendant sought to flee *in order to* conceal his identity from the police[10] and that he did so out of a consciousness of guilt. We note that a very well-respected treatise concerning the law of evidence states as follows:

> "It is universally conceded today that the fact of an accused's flight * * *, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." 2 John H. Wigmore, *Evidence in Trials at Common Law,* § 276 at 122 (Chadbourn rev.1979).

Accordingly, in our judgment, the presence of the language of concealment in the flight instruction did not constitute reversible error.

### D

### Timing of Flight

The defendant further challenges the trial justice's failure to include in the instruction certain language from *Cooke* that defendant had requested regarding the probative value of flight being greater when it occurs immediately after the commission of the crime at issue.

▆ Although a defendant is free to request that certain language be included in the jury instructions, there is no requirement that the trial justice use any particular words or phrases in the instruction. *Imbruglia,* 913 A.2d at 1030; *see also Ensey,* 881 A.2d at 95; *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988).

Although the *specific* language requested by defendant concerning the probative value of flight being greater when it occurs immediately after the commission of the crime was not included, the trial justice did include in his instruction language that informed the jury of the importance of considering the time that elapsed between the commission of the crimes and the occurrence of the flight. The trial justice instructed as follows:

> "In considering these factors, it is important that you look at the time which had elapsed between the commission of the crime and the actions of the defendant in attempting to flee or conceal himself in determining whether or not the defendant's reason for fleeing or concealing was because of the commission of a crime."

For this reason, it is our judgment that the trial justice more than sufficiently instructed the jury as to the law relevant to the issue of the timing of flight.

### E

### Recapitulation

For the reasons set forth above, it is our judgment that the trial justice more than sufficiently instructed the jury as to the law relevant to flight as evidence of guilt. Moreover, the flight instruction in no way reduced or shifted the state's burden of proof.

---

10. It will be recalled that the police were actively seeking to apprehend defendant. Officer Zincone testified that, prior to defendant's arrest on July 26, 2003, he had been looking for defendant for approximately "three to four weeks because he was wanted for several armed robberies which took place in Providence."

## II

### The Peremptory Challenge

On May 2, 2005, during jury selection for the second trial, the prosecution exercised a peremptory challenge in order to strike a particular juror; that juror (Juror 159) was the only person in the entire venire of apparent Asian heritage. The defendant, who is an African American, did not object to this peremptory challenge at the time it was made (nor did he object to the four other peremptory challenges exercised by the prosecution), and jury selection continued for the rest of the morning session. It was not until the afternoon session that defendant raised a *Batson* challenge with respect to the prosecution's peremptory challenge to Juror 159. An *in camera* conference took place to resolve defendant's motion regarding the peremptory challenge.

In view of the fact that there had been no contemporaneous objection to the challenge of Juror 159, the trial justice reserved ruling on defendant's motion until the following day. The trial justice indicated that he wanted time to determine whether, because of the belated nature of defendant's objection, the issue had been waived; he also said that he wanted time to review *Batson* and its progeny.

The next morning, the trial justice denied defendant's motion and articulated his rationale based upon the *Batson* burden-shifting approach. Specifically, the trial justice found that defendant had failed to make the required *prima facie* showing of purposeful discrimination for the following reasons: (1) Juror 159 was not of the same racially cognizable group as defendant; [11] (2) in addition to Juror 159, the prosecutor had also challenged four other prospective jurors, all of whom were Caucasian; and (3) the prosecutor had asked all prospective jurors, including Juror 159, virtually the same questions, which fact could be viewed as an indication that Juror 159 was not being treated differentially by the prosecutor.

The trial justice further stated that, although no *prima facie* case of purposeful discrimination had been made out, even if defendant had met this initial burden, his efforts to have Juror 159 restored to the panel would fail since the prosecution had offered race-neutral reasons for excluding this juror.[12] Having already determined that defendant failed to make out a *prima facie* case of purposeful discrimination, however, the trial justice was not obliged to reach the second and third steps of the *Batson* analysis.

11. With respect to this first articulated reason, it should be noted that, in *Powers v. Ohio*, 499 U.S. 400, 415–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the United States Supreme Court ruled that a criminal defendant may object to peremptory challenges based on alleged racial discrimination in jury selection regardless of whether or not the excluded juror and the defendant are of the same race. Nevertheless, prescinding from the trial justice's error in this regard, it is our view that the other two reasons enunciated by the trial justice suffice to provide a foundation for the trial justice's finding that defendant had failed to establish a *prima facie* case of purposeful discrimination.

12. At the above-referenced *in camera* conference on May 2, the prosecutor articulated three race-neutral reasons for having challenged Juror 159. These three reasons were: (1) that Juror 159 was unkempt in his attire and appearance; (2) that he displayed a lack of attentiveness during the proceedings, including the fact that he engaged in "clock-watching"; and (3) that he failed to respond to the questions posed to the venire as a group. The trial justice made reference to these reasons in the course of his ruling on the *Batson* issue.

Although he was not obliged to consider the second or third steps of the *Batson* analysis, the trial justice opined that, by looking at the totality of the circumstances, the prosecution's reasons for striking Juror 159 were race-neutral. It should be noted that the trial justice had ample opportunity to observe the prosecutor posing questions to the jury venire and exercising peremptory challenges not only in the instant trial, but in the defendant's first criminal trial as well.[13]

In the instant case, the trial justice explicitly engaged in a *Batson* analysis when considering the defendant's objection to the prosecution's peremptory challenge of Juror 159. Bearing in mind the deferential standard of review that this Court employs in this context, we perceive no basis for ruling that the trial justice was clearly wrong in finding that the defendant failed to make out a *prima facie* case of purposeful discrimination as required under the first step of the *Batson* analysis. Accordingly, the *Batson* aspect of the defendant's appeal is unavailing.

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.

**13.** The same trial justice presided over both the first trial (which ended in a mistrial) and the second. Similarly, the prosecutor who prosecuted the first trial also prosecuted the second.

It is noteworthy that, during the prosecutor's questioning of the jury venire in the first criminal trial, the prosecutor did *not* exercise either a peremptory or "for cause" challenge in order to exclude a particular African American juror who admitted that her sister had been convicted of a crime and incarcerated. (*See* footnote 4, *supra.*) This fact, known to the trial justice in the course of his ruling on defendant's *Batson* challenge during the *voir dire* prior to the second trial, supports the trial justice's ruling that this particular prosecutor was not engaging in purposeful discrimination when she exercised a peremptory challenge with respect to Juror 159.