**STATE**

v.

**Raquel FIGUEREO.**

**No. 2009–149–C.A.**

Supreme Court of Rhode Island.

Dec. 9, 2011.

---

Aaron L. Weisman, Department of Attorney General, for State.

Janice M. Weisfeld, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

On October 16, 2008, a Superior Court jury found the defendant, Raquel Figuereo, guilty of shoplifting. As her sole argument on appeal, the defendant contends that the justice of the Superior Court who presided over that trial erred in declining to instruct the jury that eyewitness *certainty* is not a reliable indicator of eyewitness *accuracy*.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

On September 27, 2007, Raquel Figuereo was charged by criminal complaint with "willfully tak[ing] possession of unpurchased goods to wit, assorted clothing, valued at $303.50, displayed, held, stored and offered for sale by [a retail store known as] Old Navy, with the intention of converting said goods to her own use without paying the purchase price thereof, in violation of [G.L.1956] § 11–41–20."[1] This charge stemmed from an incident involving defendant on September 14, 2007 (as further described below).

On December 11, 2007, after a trial in the District Court, defendant was found guilty as charged. She then opted to appeal to the Superior Court for a *de novo* trial, as was her right pursuant to G.L. 1956 § 12–22–1.

Thereafter, on October 15 and 16, 2008, a jury trial was held in the Superior Court for Kent County; that trial also resulted in a guilty verdict. We describe below what transpired at the Superior Court trial to the extent necessary to provide context for the single issue raised on appeal.

## A

## The Testimony of Linda Lewis

Linda Lewis testified at trial that she is employed by the Old Navy store in the Warwick Mall,[2] as a "loss prevention agent." She testified that in that capacity she carries out surveillance of the sales floor in an attempt to locate shoplifters. Ms. Lewis stated that, as of the time of trial, she had been employed as a loss prevention agent for two years.

Ms. Lewis went on to testify that, in preparation for becoming a loss prevention agent, she underwent thirty days of "extensive training on apprehension detail [and] surveillance." It was further her testimony that, as a result of her training, she looks for "people who rush into the store [and go] into a certain area." She also testified that she "look[s] for people who come in with empty bags or bags that are not associated [with] the area" as well as for people "who are not asking for customer service or [who are] avoiding the staff in the store." Ms. Lewis stated that she is trained to look for "four steps of proof" when scrutinizing individuals who are suspected of being shoplifters. She specified that those four steps are the following: (1) seeing the customer enter the area and select the merchandise; (2) seeing the customer conceal the merchandise and observing where the merchandise is concealed; (3) seeing the customer attempt to leave the store; and (4) observing the customer pass all points of sales with the concealed items. Ms. Lewis stated that, during her two years of experience as a loss prevention agent, she has never lost sight of a suspected shoplifter once she began to focus on that person.

Ms. Lewis testified that on September 14, 2007 she was working at the Old Navy store in the Warwick Mall. She stated that on that day she was dressed in an "undercover" manner—she explained that term as meaning that she was not clothed in a uniform that would indicate that she was part of store security. She testified that,

---

1. Old Navy has been a "brand" (or d/b/a) of Gap Inc. since 1994. *See Old Navy,* http://www.gapinc.com/content/gapinc/html/aboutus/ourbrands/OldNavy.html (last visited Dec. 2, 2011). The Old Navy stores provide "on-trend, modern clothing and accessories, as well as updated basics" for "newborns through adults." *Id.*

2. Ms. Lewis testified that she works not only at the Old Navy store in the Warwick Mall, but also at numerous other stores throughout the New England region.

on that day, eighty percent of her time was spent engaging in surveillance of the sales floor in order to look for the presence of the above-referenced indicators of a possible shoplifter.

Ms. Lewis proceeded to testify that, at a particular point in time during her surveillance on September 14, she observed three women enter the store through an entrance on the Old Navy store's "parking lot side." She further testified that two of the women had baby strollers with them and that there were toddlers inside the strollers. It was Ms. Lewis's testimony that all three of the women were "approximately twenty-five to thirty-five years old." Ms. Lewis testified that, upon entering the store, the three women headed directly for the "kids department" and then went to different locations within the store. Ms. Lewis testified that, at that juncture, she kept one of the three women under observation. (At trial, Ms. Lewis identified defendant as being the just-referenced woman whose actions she had kept under observation on September 14, 2007.)

Ms. Lewis testified that she observed defendant enter "the baby girl[s'] shop." She stated that the lighting in the baby girls' shop was extremely bright; she added that there are "hundreds of light bulbs, different light fixtures all throughout that area, throughout the whole store, actually." Ms. Lewis further testified that, while observing defendant, she stationed herself in the store's "maternity area," which was located across the aisle from the baby girls' shop. Ms. Lewis added that, even though there were some display fixtures between the maternity area and the baby girls' shop, she had a "one hundred percent visual throughout the whole area."

Ms. Lewis proceeded to testify that, at that point in her observation of defendant, defendant started to select merchandise and "was placing the items on top of the stroller [which] she had along with her." Ms. Lewis stated that she saw defendant select baby girl items in sizes 3 and 4T. It was Ms. Lewis's testimony that defendant was in the baby girls' shop for approximately ten to fifteen minutes; defendant then entered the boys' shop, which was adjacent to the baby girls' shop.

Ms. Lewis stated that she then observed defendant bend down to pick up her brown purse from underneath the stroller carriage. Ms. Lewis testified that defendant proceeded to remove the hangers from the items that she had selected and began folding those items into her brown purse. Ms. Lewis added that at that point in time she was positioned along the wall of the baby girls' shop while conducting her observation of defendant; she testified that she did "not at all" lose sight of defendant. According to Ms. Lewis, defendant was concealing the items in the brown purse and "was looking around the area nervously, looking for any customers or staff."

Ms. Lewis testified that defendant then walked out of the boys' shop, leaving the hangers behind on top of a display stand. She stated that defendant proceeded to walk through the "Kid's Main Street area," where she met her companions and "spoke to them for a few seconds, less than thirty seconds." Ms. Lewis testified that the three women then started walking towards "the mall side of the store;"[3] she added that, at that point, the above-referenced brown purse was under the stroller.

It was Ms. Lewis's testimony that she next observed defendant pass the cash registers located on the mall side of the

---

**3.** The reference in the text to "the mall" is to the interior area of the Warwick Mall. It will be recalled that defendant and the women who accompanied her had entered the Old Navy store through an entrance on the store's "parking lot side."

store. Ms. Lewis testified that she then stopped defendant, along with her companions, at the exit leading to the mall. Ms. Lewis stated that, speaking directly to defendant, she introduced herself and asked defendant to come back into the store with her to discuss "the issue." Ms. Lewis stated that defendant "got a little emotional" at that time; she added that defendant's "friends [tried] to talk [Ms. Lewis] out of bringing [defendant] back" into the Old Navy store. Ms. Lewis testified that one of defendant's friends then stated that the stroller and the child inside of it belonged to her and not to defendant. Ms. Lewis stated that she then said that the friend could come back into the store as long as defendant and the merchandise also came back. Ms. Lewis stated that at that time defendant told her that "she did not have any of [the store's] merchandise on her."

Ms. Lewis further testified that she then brought defendant, the friend who had claimed ownership of the stroller, and the baby stroller itself to a back room of the store. Ms. Lewis testified that she removed the purse from underneath the stroller and instructed defendant's friend to leave and to take the stroller; she added that she then took defendant into her office. It was Ms. Lewis's further testimony that she had a witness sit with her while she opened up defendant's purse and emptied everything from it. Ms. Lewis testified that twenty-four items of baby clothing were in defendant's purse.

Ms. Lewis stated that she informed defendant that she intended to prosecute her and would be calling the Warwick Police Department. Ms. Lewis testified that she asked defendant for whom she was stealing the clothes; she specifically asked her

"if it was for herself," to which question defendant responded in the negative. Ms. Lewis proceeded to testify that she had defendant sign certain "paperwork," in which she admitted the theft. Ms. Lewis added that the just-referenced "paperwork" is what she called a "civil demand notice;"[4] she said that that document is presented to every person who is considered to be a shoplifter. Ms. Lewis testified that by the "civil demand notice," Gap Inc.[5] "ask[s] for the value of the merchandise [to be remitted] back to [it] for the attempted shoplifting of the merchandise." Ms. Lewis testified that she observed defendant read and sign the civil demand notice.

Ms. Lewis testified that, after having defendant sign the civil demand notice, she photographed her. At the bottom of the photograph, she inscribed the following notation: "24 items, $303.50;" she testified that she did so because it was the practice for loss prevention agents to write the following information on such photographs: "the case number, the value, and the items that were recovered." Ms. Lewis stated that defendant then asked if she could use the phone, to which request Ms. Lewis acceded. Ms. Lewis testified that she overheard the phone call and heard defendant state "to the other person on the line that she got caught * * *." It was Ms. Lewis's further testimony that defendant's boyfriend arrived in the store in a matter of minutes thereafter.

## B

### The Jury Instructions

At the trial in the Superior Court in October of 2008, defendant's counsel had

---

4. The "civil demand notice" signed by defendant that is referenced in the text was admitted as a full exhibit during the Superior Court trial.

5. *See* footnote 1, *supra.*

requested that the trial justice instruct the jury as follows:

> "A witness's level of confidence in (his) (her) identification of the perpetrator is one of many factors that you may consider in evaluating whether the witness correctly identified the perpetrator. However, a witness who is confident that (he) (she) correctly identified the perpetrator may be mistaken."

The trial justice denied defense counsel's request that he read to the jury as part of his instructions the just-quoted language concerning a witness's "level of confidence."

After the trial justice had finished instructing the jury, defense counsel objected to the omission of the above-quoted language from the instructions; he stated (*inter alia*) that "the theory of the defense in this case is that you have a confident witness who is simply inaccurate * * *." The trial justice nonetheless adhered to his previous determination and opted not to alter or amend the instructions that he had given to the jury.

The defendant's appeal to this Court centers on the issue of eyewitness confidence in the context of identifying an alleged perpetrator.

## C

### The Verdict and the Sentence

On October 16, 2008, at the conclusion of the trial in the Superior Court, the jury convicted defendant of the shoplifting charge. The trial justice then sentenced defendant to (1) one year at the Adult Correctional Institutions, suspended, with one year probation; (2) a $500 fine; and (3) 100 hours of community service. Thereafter, defendant filed a timely notice of appeal.

## II

### Standard of Review

⬛⬛⬛ It is axiomatic that we review jury instructions in a *de novo* manner. *State v. Adefusika,* 989 A.2d 467, 475 (R.I. 2010); *see also State v. Palmer,* 962 A.2d 758, 764 (R.I.2009); *State v. Graham,* 941 A.2d 848, 855 (R.I.2008); *State v. Imbruglia,* 913 A.2d 1022, 1031 (R.I.2007). In our review, this Court will not consider "a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *State v. Kittell,* 847 A.2d 845, 849 (R.I.2004) (internal quotation marks omitted); *see also Adefusika,* 989 A.2d at 475; *Palmer,* 962 A.2d at 764. In reviewing jury instructions, it is our duty to ensure that they "adequately cover the law"—in which event we will uphold them. *Palmer,* 962 A.2d at 764 (internal quotation marks omitted); *see also State v. Grayhurst,* 852 A.2d 491, 517 (R.I.2004); *State v. Keiser,* 796 A.2d 471, 472 (R.I.2002) (mem.). Even if a challenged jury instruction was erroneous, "reversal is warranted only if a jury could have been misled to the prejudice of the complaining party." *Adefusika,* 989 A.2d at 475 (internal quotation marks omitted); *see also Palmer,* 962 A.2d at 764–65; *Graham,* 941 A.2d at 855.

## III

### Analysis

⬛⬛ On appeal to this Court, defendant contends that the trial justice committed reversible error in declining to give a particular jury instruction; she has contended in her brief, as she did at oral argument, that she was entitled to an instruction that would have informed the jury that "an eyewitness's certainty is not a reliable indicator of eyewitness accuracy."

Very significantly, however, the instruction that on appeal defendant contends

should have been given differs greatly in wording and in meaning from the language which defendant at trial actually requested the trial justice to include in his instructions. At trial, defendant specifically requested the following:

"A witness's level of confidence in (his) (her) identification of the perpetrator is *one of many factors* that you may consider in evaluating whether the witness correctly identified the perpetrator. However, a witness who is confident that (he) (she) correctly identified the perpetrator *may be mistaken.*" (Emphases added.)

As we discuss below, the message conveyed by the just-quoted language is substantially different from the message which defendant now contends should have been conveyed to the jury. In colloquial terms, the two messages differ from each other just as apples differ from oranges.

■■ This Court staunchly adheres to the "raise or waive" rule,[6] which requires parties to raise an issue first in the trial court before raising it on appeal. *See, e.g., DeMarco v. Travelers Insurance Co.,* 26 A.3d 585, 628 (R.I.2011) (noting that "[t]his Court has repeatedly indicated that it adheres to what is commonly called the 'raise or waive' rule—*i.e.,* we do not consider

issues on appeal which were not raised and properly presented during proceedings in the court below"); *State v. Hak,* 963 A.2d 921, 927 (R.I.2009) (stating that "[t]his Court's familiar raise-or-waive rule precludes us from considering issues at the appellate level that were not properly presented before the trial court"); *State v. Saluter,* 715 A.2d 1250, 1258 (R.I.1998) (explaining that "[i]t is axiomatic that this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court" (second alternation in original) (internal quotation marks omitted)). It is well-settled that this Court will not review issues that were not presented to the trial court " 'in such a posture as to alert the trial justice to the question being raised.' "[7] *Pollard v. Acer Group,* 870 A.2d 429, 433 (R.I.2005) (quoting Joseph R. Weisberger, *Rhode Island Appellate Practice,* Rule 16.5 at 89 (1993)); *see also State v. Diefenderfer,* 970 A.2d 12, 30 (R.I.2009); *State v. Bido,* 941 A.2d 822, 828–29 (R.I.2008).

At trial, defendant did not request the instruction that serves as the focus of her appeal to this Court—*viz.,* that "an eyewitness's certainty **is not a reliable indicator** of eyewitness accuracy." (Emphasis added.) Instead, she made a very different request of the trial justice—*viz.,* that he

---

**6.** We recently had occasion to comment as follows: "[T]he raise or waive rule is not some sort of artificial or arbitrary Kafkaesque hurdle. It is instead an important guarantor of fairness and efficiency in the judicial process." *DeMarco v. Travelers Insurance Co.,* 26 A.3d 585, 628 n. 55 (R.I.2011); *see also National Association of Social Workers v. Harwood,* 69 F.3d 622, 627 (1st Cir.1995) (stating that the raise-or-waive rule should not "be dismissed as a pettifogging technicality or a trap for the indolent; the rule is founded upon important considerations of fairness, judicial economy, and practical wisdom").

**7.** It is true that this Court has recognized an exception to the raise-or-waive rule when

"basic constitutional rights are concerned." *State v. Donato,* 592 A.2d 140, 141 (R.I.1991); *see also State v. DeOliveira,* 972 A.2d 653, 660 n. 6 (R.I.2009); *State v. Gomez,* 848 A.2d 221, 237 (R.I.2004). However, for that exception to apply, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *State v. Breen,* 767 A.2d 50, 57 (R.I.2001). It has not been suggested (nor do we believe) that the above-referenced narrow exception could properly be invoked in this case.

instruct the jury that "a witness who is confident that (he)(she) correctly identified the perpetrator **may be mistaken.**" (Emphasis added.)

In other words, defendant contends on appeal that she was entitled to an unsubtle and procrustean instruction that would have in effect taken eyewitness certainty completely off the table as a factor for jury consideration—whereas at trial, she merely requested that the jury be instructed that an eyewitness "may be mistaken" even if that witness is confident about the correctness of his or her identification. In view of the principle that this Court will not review contentions that are raised for the first time on appeal, defendant has quite obviously waived her right to argue to this Court in favor of an instruction that "eyewitness[ ] certainty is **not a reliable indicator** of eyewitness accuracy." (Emphasis added.) [8]

\* \* \* \* \* \*

■■■ We would add that, even if defendant, rather than espousing a very different theory on appeal, had properly focused her attention on the instruction that she requested and that the trial justice declined to give, her appeal would still be unavailing. It would be unavailing because, as we explain below, the jury was in essence instructed in accordance with defendant's expressed wishes—although not in the precise words that she requested.

■■■ It is a fundamental principle that a trial justice must "instruct the jury on the law to be applied to the issues raised by the parties." *Adefusika,* 989 A.2d at 477 (internal quotation marks omitted); *see also State v. Lynch,* 770 A.2d 840, 846 (R.I.2001). However, it is an equally basic principle that "[w]hile a defendant may request that the trial justice include particular language in the jury instructions, the trial justice is not required to use any specific words or phrases when instructing the jury—so long as the instructions actually given adequately cover the law." *Adefusika,* 989 A.2d at 477 (internal quotation marks omitted); *see also Palmer,* 962 A.2d at 764, 769; *Imbruglia,* 913 A.2d at 1030; *State v. Ensey,* 881 A.2d 81, 95 (R.I.2005). In other words, while the obligation to "adequately cover the law" (*Palmer,* 962 A.2d at 764) remains ever present, the trial justice is not precluded from instructing the jury in his or her own words. *Adefusika,* 989 A.2d at 477 & n. 7; *see also State v. D'Alo,* 435 A.2d 317, 319 (R.I.1981) (stating that a "trial justice is free to instruct the jury in his own words \* \* \* as long as he [or she] states the applicable law").

When we compare the above-quoted instruction that defense counsel requested be given to the jury (*viz.,* that "a witness who is confident that (he)(she) correctly identified the perpetrator may be mistaken") with the text of the entire actual charge to the jury, we are of the opinion that the trial justice did in fact present the jury with *the essence* of defendant's requested instruction. The following excerpts from the instructions given by the trial justice exemplify the fact that the jurors were clearly advised that they had the right to reject the identification testimony of a confident witness:

"The testimony you have heard concerning identification represents the witness's expression of her belief or impression. You don't have to believe that the

---

8. Since we have concluded that defendant did not raise before the trial court the instructional language that she wishes this Court to pass upon, we decline to make any comment about that language or about defendant's contentions as to the teachings of social science. Such is our usual practice. *See Grady v. Narragansett Electric Co.,* 962 A.2d 34, 42 n. 4 (R.I.2009) (stating that this Court's "usual policy [is to] not opin[e] with respect to issues about which we need not opine").

identification witness was lying or not to find the defendant not guilty. *It is enough that you conclude that the witness was mistaken in her belief or impression.*

"Many factors affect the accuracy of identification. In considering whether the prosecution has proven beyond a reasonable doubt that the defendant is the person who committed the crime, you may consider the following: Did the witness have an adequate opportunity to observe the person who committed the crime?

"In answering this question, you should consider the length of time the witness observed that person, the distance between the witness and person; the extent to which that person's features were visible and undisguised; the lighting conditions at the time of the observation; whether or not there were any distractions occurring during the observation, and any other circumstances that affected the witness's opportunity to observe the person committing the crime.

"A second question is this: Did this witness have the capacity to observe the person committing the crime? In answering this question, you may consider whether the capacity of the witness was impaired by stress or fright at the time of observation, personal motivations, biases or prejudices, uncorrected visual defects or other factors you find from the evidence. You may also consider whether the witness is of a different race than the person identifying. Identification by a person of a different race may be less reliable than identification by a person of the same race." (Emphasis added.)

Although the trial justice did not explicitly employ the defendant's requested language, he nonetheless did convey to the jurors the message (1) that they should scrutinize the testimony of an identification witness from several points of view and (2) that they were free to (in the words of the trial justice) "conclude that the witness was mistaken in her belief or impression." Having reviewed the testimony of Linda Lewis (*see* section I A, *supra*) and having carefully examined the instructions given to the jury, we perceive no error. *See Imbruglia*, 913 A.2d at 1033 (stating that in that case "there was no error in the trial justice's denial of defendant's request that the particular phraseology proposed by defendant be employed" because he " 'fairly covered' the concept expressed by those words").

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.