July 13, 2023

**Supreme Court**

No. 2021-93-C.A.
(P1/19-1489A)

State                              :

v.                              :

James Robinson.                              :

NOTICE:   This opinion is subject to formal revision
before publication in the Rhode Island Reporter.  Readers
are requested to notify the Opinion Analyst, Supreme
Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Telephone (401) 222-3258 or
Email     opinionanalyst@courts.ri.gov,     of     any
typographical  or  other  formal  errors  in  order  that
corrections may be made before the opinion is published.

State                              :

v.                                 :

James Robinson.                    :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, James Robinson, appeals

from a March 29, 2021 judgment of conviction and commitment on three counts of

first-degree sexual assault entered following a jury trial.  On appeal, the defendant

contends that: (1) the trial justice violated his constitutional right to present a

defense by excluding certain proposed expert testimony; (2) the trial justice

erroneously instructed the jury that there was no need for the complaining

witness's testimony to be corroborated in order to support a guilty verdict even

though the complaining witness did not testify as to penetration; and (3) the trial

justice improperly limited the redirect examination of the defendant.

For the reasons set forth in this opinion, we affirm the judgment of the

Superior Court.

- 1 -

# I

# Facts and Travel

This case involves allegations of sexual assault made by the complaining witness, Ashley Pedini, against defendant. The assaults at issue allegedly took place in the early morning hours of February 1, 2019.[1]

On April 1, 2019, defendant was charged by indictment with three counts of first-degree sexual assault in violation of G.L. 1956 § 11-37-2.[2] On February 4, 2020, the trial justice heard pretrial motions, including several motions *in limine*. Importantly, the trial justice granted the state's motion to exclude the expert testimony of Patricia R. Recupero, M.D., a psychiatrist who was to testify on behalf of defendant about alcoholic blackouts affecting memory. Immediately thereafter, on February 5, 2020, defendant moved for reconsideration of the court's decision to exclude Dr. Recupero's testimony, which motion the trial justice denied later that same day. A jury trial commenced on February 6, 2020, and it continued on February 7 and 10, 2020. On February 11, 2020, after having deliberated, the jury returned a guilty verdict on all three counts. On February 23, 2021, the trial

---

[1]    For the sake of narrative clarity, this opinion refers to the incident in question as having occurred in the "night" of February 1, 2019.

[2]    General Laws 1956 § 11-37-2 provides in pertinent part: "A person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if any of the following circumstances exist: (1) The accused knows or has reason to know that the victim is mentally incapacitated, mentally disabled, or physically helpless."

justice sentenced defendant to forty-five years at the Adult Correctional Institutions, with twenty-two years to serve and the balance suspended, with probation on each count, to be served concurrently. A timely notice of appeal was filed on March 11, 2021. We relate below the salient aspects of the pretrial hearings and of the trial itself.

**A**

**The Motion to Exclude the Testimony of Dr. Patricia R. Recupero**

**1. Doctor Recupero's Testimony**

As previously indicated, on February 4, 2020, the trial justice conducted a pretrial hearing to consider the admissibility of the proposed testimony of defendant's expert witness, Dr. Recupero. At the hearing, Dr. Recupero stated that, after attending law school and practicing law for a period of time, she attended and then graduated from the Alpert Medical School at Brown University. She testified that, after completing her general psychiatry residency, she became board-certified in general psychiatry and later obtained additional "qualifications * * * in forensic psychiatry" and "addiction psychiatry." She stated that she was licensed to practice medicine in Massachusetts and Rhode Island.

Doctor Recupero added that she was a clinical professor of psychiatry at Brown University and that she was on the medical staff at Butler Hospital and Kent Hospital. In particular, she stated that she had worked on the medical staff at

Butler Hospital for over twenty-five years in roles that included Medical Director, President, and CEO. Doctor Recupero stated that, in preparing for her testimony, she reviewed excerpts from the grand jury testimony and the bail hearing associated with this case. She additionally reviewed literature on the issue of "alcoholism blackouts." The prosecutor did not contest Dr. Recupero's qualifications.

Next, Dr. Recupero discussed what she would be testifying to at trial if permitted to testify. She began by explaining the functioning of memory. She stated that "when we hear or see or experience something, we encode that memory and it's in [the] short-term memory." She explained that "if we're going someplace and we see something along the way, we may take notice of it, and it is kept in short-term memory for a short period of time unless it develops some significance for us." Doctor Recupero testified that, when something in short-term memory becomes significant for a person, it is then transferred into long-term memory—a process that typically occurs "at night in our sleep." She testified that "the major part of the brain that is involved in this process of [transfer from] short-term memory to long-term memory is the hippocampus * * *." The consumption of alcohol, according to Dr. Recupero, can affect the hippocampus. She noted that "[t]here is really no study" that identified what level of alcoholic intoxication would affect the brain. Doctor Recupero noted that a person's level of

alcoholic intoxication can be affected by "drugs and other conditions," including drugs called benzodiazepines. (Doctor Recupero cited the following as examples of such drugs: Xanax, Valium, Ativan, Klonopin, and Serax.)

Turning to the subject of "[a]lcoholic blackouts," Dr. Recupero explained that they are "periods of amnesia, that is forgetting what happened while one was under the influence of alcohol." According to Dr. Recupero, there can be "complete blackout[s]" (as when a person remembers leaving his or her house and does not remember anything upon waking up the next morning) or "fragmentary blackouts" (as when a person remembers parts of what happened when under the influence of alcohol, but not the events in their entirety). Doctor Recupero stated that complete blackouts and fragmentary blackouts can be primed or cued— meaning that another person's account can aid in bringing about remembrance of certain events, but she noted that, generally, some "periods are completely lost and can't be remembered by that person."

According to Dr. Recupero, not everyone who consumes alcohol will experience a blackout. She added that there is no way to predict that a blackout is going to occur because "the blackout part of the operation in the brain is the part that occurs later when the short-term memory doesn't get turned into a long-term memory." She emphasized that "[t]he essence of the blackout is that you don't remember what you did, and so they actually are functional at some level, but they

just don't remember it." Doctor Recupero distinguished the meaning of blacking out from the meaning of passing out. She stated that passing out occurs when a person falls asleep or is "in some sort of state that the person is not conscious any more as a result of the chemicals." According to Dr. Recupero, unlike *blackouts*, a person who had *passed out* could wake up the following day and remember everything that happened while he or she was intoxicated; and she added that passing out usually results in the loss of voluntary behavior.

Doctor Recupero explained that a person in a blackout state may engage in volitional activities which the person normally would not have engaged in—such as "ha[ving] intercourse with someone that they wouldn't have had intercourse with in the past." She followed this by testifying that her review of the literature on the topic indicated that there were cases where those who had blacked out felt they had consented to sexual encounters, whereas others felt that they "never agreed to do that."

Doctor Recupero testified on cross-examination that she had not formed "any opinion about whether or not [Ms. Pedini] as an individual was consuming [alcohol] at a rate or a substance that would have led her to have a blackout." Doctor Recupero asserted that she had no opinions about Ms. Pedini's state during the night in question; and, more specifically, she conceded that she could not testify as to whether Ms. Pedini "was in an alcohol-induced blackout at all that

night."  Likewise, Dr. Recupero acknowledged that she could not testify as to whether Ms. Pedini was passed out that night.

## 2. The Trial Justice's Ruling

The trial justice granted the state's motion *in limine* to exclude Dr. Recupero's proposed expert testimony.  The trial justice first found that Dr. Recupero's proposed expert testimony satisfied the four reliability factors set forth in *DiPetrillo v. Dow Chemical Company*, 729 A.2d 677 (R.I. 1999).  He acknowledged that Dr. Recupero's testimony as to alcohol's effect on the hippocampus and the memory process in general was beyond the knowledge of an ordinary individual.  However, the trial justice determined that Dr. Recupero's proposed testimony was not relevant under Rule 401 of the Rhode Island Rules of Evidence.  He noted that her testimony was not probative of whether or not there was a sexual assault while Ms. Pedini was "physically helpless or mentally incapacitated" as alleged in the indictment.  In addition, the trial justice found that, in view of the provisions of Rule 403 of the Rhode Island Rules of Evidence, Dr. Recupero's testimony would "confuse the issues in the case" and would be misleading to the jurors as to what issues they were to decide and would lead to speculation.  Additionally, the trial justice asserted that the testimony would constitute "undue vouching for the credibility of the defendant" if he were to

testify. The trial justice accordingly determined that the testimony was not relevant and that any arguable relevance was "outweighed by its danger * * *."

On February 5, 2020, defendant moved for reconsideration of the trial justice's ruling that the proposed expert testimony was to be excluded. Reiterating much of his reasoning articulated in support of his initial decision, the trial justice denied defendant's motion to reconsider.

Thereafter, the trial ensued.

## B

## The Trial Testimony

### 1. The Testimony of Ashley Pedini

Ms. Pedini testified that she first met defendant at a karaoke lounge in Pawtucket, Rhode Island, approximately a year before the time of the alleged incident. She testified that, after that initial meeting, she continued to "hang out" with defendant and would characterize the nature of their relationship as being that of "pretty good friends." Ms. Pedini stated that she had made it clear to defendant that her sexual orientation was lesbian and that she had a girlfriend at the time.

Ms. Pedini next testified as to the night of the alleged incident, February 1, 2019. She stated that, on that date at around 2:00 a.m., she was at home alone. She explained that she felt suicidal and had "tried to kill [her]self by mixing alcohol, hard alcohol, with pills." Ms. Pedini added that she had consumed alcohol

prior to that date, but never to such a degree; she added that she had never mixed drugs with alcohol prior to that night. Ms. Pedini testified that, during the night in question, she consumed a substance "known as Seroquel, and there was a generic version of Ativan, which is an anti-anxiety med, and then some pain killers/muscle relaxers with the alcohol." She stated that all the pills belonged to her, with the exception of the Seroquel, which belonged to her father.

After consuming both the pills and the alcohol, Ms. Pedini reached out to her girlfriend, who did not answer the phone; and she also reached out to another friend. She testified that the only person who answered her phone calls was defendant. She stated that, after she spoke with defendant on the phone, he came over to visit her. Ms. Pedini testified that she had no memory of defendant arriving at her door. She stated that the next thing she remembered was that she was sitting with defendant at her kitchen table; she also remembered defendant asking if he could smoke marijuana as well as the fact that he pulled out a bottle of what she thought was vodka.

Ms. Pedini testified that her next memory after sitting at the kitchen table consuming alcohol and substances with defendant was "[w]aking up many hours later, totally naked in [her] bed." She stated that, upon waking up, she felt "[a] lot of pain" in both her "vagina area" and her "rectum area." She further testified that she observed blood on her bedding, on the bathroom floor, and on the kitchen

- 9 -

floor; she added that the blood had not previously been present in those locations. Ms. Pedini also testified as to certain bruises on her leg and her "buttocks area" as well as to blood on the underwear which she had been wearing.

Ms. Pedini testified that, after the night of the alleged incident, she communicated with defendant over Facebook Messenger,[3] which was her typical method of communication with him. She stated that she responded to defendant's messages because, for reasons such as her lack of memory and her physical state after the alleged incident, she "wanted to know what [had] happened." Ms. Pedini testified that, when she asked defendant if anything had happened between the two of them, defendant responded: "Not like that." In referencing the messages, Ms. Pedini noted that defendant claimed that he "began to worry about [her] once [she] fell asleep, because [he] had no idea how many different meds [she] took." She testified that she indicated in her messages to defendant that she had cleaned up the blood on the floor, but she said that defendant responded that he did not remember either of them bleeding.

Ms. Pedini testified that she asked defendant a few more times if anything had happened between them, which question he continued to answer in the

---

[3]    Meta Platforms, Inc., which is the owner of both Facebook and Messenger, describes Messenger as "a simple yet powerful messaging application for people to connect with friends, family, communities, and businesses across platforms and devices through text, audio and video calls." Meta Platforms, Inc., Annual Report (Form 10-K) 7 (Feb. 2, 2023).

negative. She stated that she had also thanked defendant "for being there" and told him that he was "such a good person" in response to his saying that he could not have left her "in that condition alone." Ms. Pedini testified that, in messaging defendant, she informed him that she woke up with no clothes on and that she asked him if she became undressed "in front of [him] or after [he] left," to which he responded that she was still dressed when he left.

Ms. Pedini testified that, shortly thereafter, defendant messaged her again, asking if she was doing better. She stated that defendant told her that he did not remember "how much [they] took," and that he had "never done that before." She testified that she again mentioned to him that she had found blood and thought that "when [they] snorted [they] could have bled from the nose." Ms. Pedini testified that she explained to defendant that she was asking if anything had happened because she had "blacked out." She further stated that defendant responded to her saying: "I don't remember anything after cooking tacos. I don't even remember eating them." Ms. Pedini testified that she asked defendant if he thought they had "d[one] anything" while they were blacked out. She stated that defendant again responded that he did not think that anything had happened.

Ms. Pedini testified that, on February 6, 2019, defendant messaged her again. She stated that she told him that "certain signs [led her] to believe something [had] happened" between them and that, if he would not admit to

something having happened or if he did not remember something having happened, she did not feel comfortable talking to him. Ms. Pedini testified that, in her message to defendant, she insisted that something had happened between them due to the fact that she woke up bleeding and was in pain the morning after the alleged incident. She testified that she continued to encourage defendant to tell her "how far [they] went" and that she needed "closure."

Ms. Pedini testified that the next time she communicated with defendant was when she contacted him to ask again if he was able to recall if anything had happened between them. She stated that defendant replied that he had remembered Ms. Pedini being "passed out on the computer chair" in her room. She said that he also told her that he had checked to make sure she was breathing properly and that he remembered "picking [her] up * * * laying [her] on the bed, * * * laying down with [her] to hold [her] to sleep." Ms. Pedini testified that she then asked defendant if he recalled her being naked or partially undressed at any time while he was with her, and she continued to ask defendant whether they had done "anything sexual in any fashion." According to Ms. Pedini, defendant stated in response: "I don't remember anymore. I've never had pills in my system like that, and now you fear something happened and you're going to press charges and that's never what I wanted to happen." Ms. Pedini further testified that defendant stated that it was his recollection that she was clothed when he was with her.

- 12 -

Ms. Pedini testified that, on February 7, 2019, defendant messaged her again and stated in his messages that he still did not remember much, but he thought that, when they had lain down together, he had put his arm around her. She further testified that defendant explained that she was still dressed and that he was "running [his] hands up and down [her] stomach" and that she put her hand on his. Ms. Pedini stated that defendant also described putting his hand under her shirt "and continu[ing] rubbing;" he said that he then felt her "hair and went lower." According to Ms. Pedini, defendant stated that she did not stop him and that he put his "finger over it" and started touching her. She further testified that defendant told her that she "seemed very comfortable." Ms. Pedini testified that she responded in her messages to defendant that she was "comfortable" because she "was totally knocked out." Ms. Pedini testified that defendant confirmed that he digitally penetrated her, but he insisted that she was not "totally knocked out" because she was "consciously moving [her] hand over [his] rubbing them." She further stated that defendant indicated that he did not remember "penetrating [her] with [his] penis."

Ms. Pedini also testified that defendant eventually acknowledged that he pulled her pants down when he was "playing" with her. She said that she also asked defendant again if he recalled using his "penis inside [her] or in [her] mouth or hands." She testified that defendant responded that, after their conversation, it

was getting "impossible to [d]oubt" that he penetrated her vagina; however, he maintained that he could not remember well enough to provide a definitive answer. Ms. Pedini testified that, in their messages, defendant could only confirm that he remembered digitally penetrating her, but he stated that he did not believe Ms. Pedini to be "blacked out" at that time and that her reactions were those of "enjoyment and comfort."

Ms. Pedini testified that, at some point after what she alleged had occurred on February 1, 2019, she contacted her then-girlfriend, Amanda Miller. She stated that it was Ms. Miller who contacted the police department to report what had allegedly occurred on February 1. According to Ms. Pedini, she had Ms. Miller place the phone call to the police because she feared repercussions stemming from her drug use during the night in question. Ms. Pedini testified that, at some later point in time, she went to the police station with Ms. Miller and identified defendant as the person whom she accused of assaulting her. She also provided the police with a statement as well as the Facebook Messenger messages and pictures of her bruises. She added that, after her meeting at the police station, Sergeant Nathan Gallison came to her home to collect "physical evidence" such as bedding and the clothing which she was wearing on the night of the alleged incident. Ms. Pedini added that she sought medical attention on February 5, a few days after the

incident in question had allegedly taken place.[4]  She testified that she complained to the doctor about pain and irritation in her vaginal and rectal areas.

## 2. The Testimony of Detective Susan Cormier

Detective Susan Cormier of the Pawtucket Police Department also testified at trial. She testified that she became involved with Ms. Pedini's case after a report was generated through the patrol division and the case was assigned to her. Detective Cormier stated that, after reviewing the documentation available concerning Ms. Pedini's case, she applied for an arrest warrant for defendant.  She acknowledged that she was assigned to the case on February 11, 2019 and that, by February 12, she was in possession of a signed, active arrest warrant.  She further confirmed that defendant eventually turned himself in on March 5, 2019. Detective Cormier testified that, at some point, defendant was escorted to the interview room, where she and another detective took his statement.  Detective Cormier indicated that the interview with defendant was recorded.  A video of that interview was entered as a full exhibit at trial, and it was played in its entirety for the jury.

Upon the conclusion of Det. Cormier's testimony, the state rested, and defendant moved, pursuant to Rule 29 of the Superior Court Rules of Criminal

---

[4]     Ms. Pedini testified that she met with Emily Harrison, M.D.  According to Dr. Harrison's testimony at trial, Ms. Pedini returned for a second visit on February 12, 2019 "to talk about further sexually transmitted infection testing and to be evaluated for a vaginal discharge."

Procedure, for a judgment of acquittal, which motion the trial justice denied. After the denial of the Rule 29 motion, defendant proceeded to testify.

### 3. The Testimony of Defendant James Robinson

The defendant testified that he first met Ms. Pedini at a bar in Pawtucket in or about "[l]ate August, early September" of 2018. He stated that, when he first met Ms. Pedini, he was not interested in her romantically; he added that Ms. Pedini did not "express any kind of interest" in him because "she let [him] know that she was a lesbian." The defendant testified that he and Ms. Pedini would "go out about two or three times a month" and that he had been to Ms. Pedini's apartment on a few occasions before the night when the alleged sexual assault took place.

The defendant proceeded to provide testimony as to the details of the night in question—February 1, 2019. He stated that Ms. Pedini called him around 2:00 a.m., "crying hysterically." He said that she told him that no one had "contacted her for her birthday" and that "she was going to kill herself." The defendant testified that Ms. Pedini asked him if he could bring alcohol over and that she gave him the option of sleeping over at her apartment. The defendant further testified that, when he arrived at her apartment, Ms. Pedini opened the door and let him in and that he followed her into the house up "[h]alf a flight" of stairs. He stated that she was moving in a "very coordinated" manner. He continued: "Her language was articulate. She [spoke] very well. There was nothing out of the ordinary."

- 16 -

The defendant further testified that Ms. Pedini indicated to him that she had taken Seroquel and "was going to take other pills."

The defendant stated that, when seated at the kitchen table with Ms. Pedini, he took out two bottles of alcohol as well as some marijuana. He stated that he poured drinks and that, at the suggestion of Ms. Pedini, they each ingested a Klonopin pill. The defendant testified that, after Ms. Pedini took that pill and during the course of the rest of the evening, "she [also] crushed a couple of pills for [them] to snort * * *." He added that, after they consumed the last set of pills, each of them poured another drink and Ms. Pedini asked him if he "had herpes." The defendant added that Ms. Pedini mentioned to him that the karaoke bar to which they had gone in the past had not let them perform a song called "The Whisper Song"—a song which, in his words, "has some sexually strong lyrics." The defendant further testified that Ms. Pedini insisted on making vegan tacos for him; but he added that, once she finished cooking them, she threw out what she had cooked because "there were no taco shells."

The defendant testified that, shortly thereafter, he informed Ms. Pedini that he needed to get some rest so that he could "be ready for work in the morning." The defendant stated that they then made their way into her bedroom. He added that Ms. Pedini stumbled—apparently stumbling over something on the floor. When defendant asked Ms. Pedini if she was "all right," she responded that she

was fine and that defendant had "seen [her] far more drunk than this before." He testified that, when they entered her bedroom, he sat on her bed, took off his shoes, and prepared to lie down. He stated that, while he was sitting on the bed, Ms. Pedini sat down in a nearby chair in the bedroom and they continued their conversation. The defendant added that Ms. Pedini informed him that she was also going to lie down. He testified that Ms. Pedini then extended her hand and that he "grabbed her hand" and they "walked towards the bed." The defendant stated that, after she sat on the bed, he "slid her over towards the middle of the bed."

According to defendant, once he and Ms. Pedini were both on the bed, she told him that he could hold her. He stated that he began "to spoon her and hold her, and she rub[bed his] hand." The defendant testified that he was positioned behind Ms. Pedini and began rubbing her stomach with Ms. Pedini's hands holding his wrist. He further stated that he then reached down, unbuttoned her pants, and slid them down along with her underwear. The defendant maintained that Ms. Pedini did not say anything to him at this point but she was "moaning and rubbing against [him]" and "threw her hip up" so that defendant could slide her pants down. The defendant further testified that he rubbed his fingers over her clitoris.

The defendant testified that he began to unbutton his own pants and that, while he was unbuttoning his pants, Ms. Pedini "began to play with herself." He stated that, once his pants were below his knees, he put his "hands on her hips to

- 18 -

adjust her to get ready to have sex." He continued that he was going to try and get her on top of him, but that, because she "resisted being lifted up," they remained in the "sideways" position. The defendant testified that, as he went to enter her vagina, "she gasped, and she continued moaning, and she [threw] her hand back on [his] hip, on [his] leg" and held it. The defendant further stated that he and Ms. Pedini had sex for a few minutes and that they eventually both fell asleep in the spooning position. He testified that at no point did Ms. Pedini signal to him that she did not want to engage in sexual activity.

The defendant stated that, when he awoke the following morning, he went "into the kitchen to clean up the table" because he did not want Ms. Pedini's "house to be looking like a mess when someone got there." After cleaning the kitchen table, defendant went into Ms. Pedini's bedroom, checked to see if she was still breathing, and informed her that he was going to work. He testified that he did not see any blood anywhere.

The defendant stated that, when he went to the police station after discovering that there was a warrant out for his arrest, he did not know that the police were in possession of the messages between Ms. Pedini and him. When asked at trial what he was thinking when he found out that the police had those messages, he testified that he thought he "had dug a hole that would be hard to get out of." The defendant acknowledged that he lied to the police on the video

because he felt that, if he admitted that he and Ms. Pedini had sex, the police "would take that as that [he] raped her." He further testified that, when he received the first message from Ms. Pedini, he did not initially believe that it was she and thought that it could have been her girlfriend. He noted that he realized it was Ms. Pedini reaching out to him when "she mentioned finding [his] tiger's eye rock."

When asked why he continued to lie to Ms. Pedini once he realized that the sender of the message was not her girlfriend, defendant stated that he "began to pick up the vibe that she was upset and angry" and also that "she didn't remember anything." He further testified that he did not tell her that they had sex because he was hoping that he could trigger her own memory. The defendant also stated that he did not just tell her the truth because he was scared and he did not know how to respond.

Among other questions posed during cross-examination, the prosecutor asked defendant how long he had had the transcript of his statement to the police. The prosecutor asked whether defendant's testimony at trial was the first time he had ever said to anyone that Ms. Pedini "requested alcohol be brought to her house" when they spoke by telephone. The prosecutor then stated: "Sir, let's be frank. You've had this transcript, the one you're looking at, for a couple months now, haven't you?" The defendant answered that question in the negative, and the

prosecutor further asked him: "You've never looked at the transcript in front of you right now?" The defendant again responded that he had not.

During redirect examination, defense counsel asked defendant if he had given him a copy of the transcript about which the prosecutor had asked. The defendant answered in the negative. Defense counsel then asked defendant why he had not been given a copy, and defendant answered: "Because you knew I was going to be telling the truth up here so I didn't need to." The prosecutor objected to defendant's answer, and the trial justice sustained the prosecutor's objection and instructed the jury to disregard defendant's answer.

When defense counsel asked defendant if he had previously given him a copy of the Facebook Messenger messages about which there had been testimony, defendant answered yes. The prosecutor then objected when defense counsel asked: "What did I tell you when I gave you the text messages about why I wasn't giving you the transcript?" The trial justice sustained that objection. The prosecutor objected on relevancy grounds when defense counsel then said to defendant: "Tell the jury about how many times you and I have practiced this testimony." The trial justice again sustained the objection. Defense counsel asked to be heard, and he argued that the prosecutor was "trying to insinuate to the jury that [defendant] had practiced and that he was familiar with the transcript. I simply want the jury to be aware factually how many times he and I discussed his

testimony." The prosecutor stated that she only asked defendant whether he had a transcript of the police statement and thus did not "open the door" to how many times defendant practiced his testimony. The trial justice ruled: "She never brought that up. She asked him if he had a copy. He said no. That was the end of it. You're the one who opened up the door in asking him about how many times we practiced and what we practiced, * * * so * * * it's denied."

Upon resting his case, defense counsel renewed his Rule 29 motion, stating that it was based upon "the aforementioned grounds," and he "reincorporate[d]" his arguments relative to same. The prosecutor objected to the motion, incorporating by reference the state's previously made arguments. The trial justice again denied the Rule 29 motion.

When the parties completed their respective closing arguments, the trial justice included the following instruction among his jury instructions:

> "Now, the testimony as I also told you earlier and it's also contained in the General Laws, is that the testimony of the victim need not be corroborated in prosecutions under this chapter. So the testimony of the victim Ashley Pedini, if believed by you, is sufficient to find a finding of guilt beyond a reasonable doubt if it constitutes proof beyond a reasonable doubt of each of the elements of the offense charged. So that testimony, if believed, and if it constitutes proof of each element of the offense beyond a reasonable doubt, need not be corroborated in order to return a verdict of guilty."

## II

## Issues on Appeal

The issues before this Court are: (1) whether the trial justice erred in excluding the proposed expert testimony of Dr. Recupero; (2) whether the trial justice erred in instructing the jury that there was no need for Ms. Pedini's testimony to be corroborated in order to support a guilty verdict even though Ms. Pedini did not testify as to the penetration element of the charged offenses; and (3) whether the trial justice erred in limiting the redirect examination of defendant about his preparation for trial. We shall address defendant's contentions *seriatim*.

## III

## Standards of Review

## A

## The Standard of Review as to the Evidentiary Issue

This Court, when "reviewing a trial justice's decision concerning the admissibility of expert testimony, * * * will not reverse the decision unless the trial justice abused his or her discretion, thereby causing substantial injury to the party seeking the admission of such evidence." *State v. Gardner*, 616 A.2d 1124, 1128 (R.I. 1992) (internal quotation marks and brackets omitted). The trial justice's ruling will be sustained provided that his or her discretion "has been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to

all the facts and with a view to the rights of all the parties to the action * * *."
*State v. Gaspar*, 982 A.2d 140, 154 (R.I. 2009) (internal quotation marks omitted).

## B

### The Standard of Review as to the Jury Instruction Issue

This Court has made clear that our "standard of review concerning jury instructions is well settled; we review such instructions in a *de novo* manner." *State v. Adefusika*, 989 A.2d 467, 475 (R.I. 2010); *see also State v. Palmer*, 962 A.2d 758, 764 (R.I. 2009); *State v. Graham*, 941 A.2d 848, 855 (R.I. 2008); *State v. Imbruglia*, 913 A.2d 1022, 1031 (R.I. 2007); *State v. John*, 881 A.2d 920, 929 (R.I. 2005); *State v. Hurteau*, 810 A.2d 222, 224-25 (R.I. 2002).

## C

### The Standard of Review as to the Redirect Examination Issue

It is well settled that the "permissible scope of redirect examination * * * rests in the sound discretion of the trial justice and will be reviewed only for an abuse of discretion." *State v. Studley*, 671 A.2d 1230, 1231 (R.I. 1996).

## IV

### Analysis

The defendant first argues that the "exclusion of Dr. Recupero's expert testimony constitutes reversible error." Specifically, defendant avers that her proposed expert "testimony was highly relevant as to whether [Ms. Pedini] was

mentally incapacitated and/or physically helpless" and also "as to whether [Ms. Pedini] could and/or did [provide] consent." Additionally, defendant maintains that the "probative value of this testimony was not outweighed by the speculative or *de minimis* risk of confusion, speculation, or bolstering." The defendant also advances the argument that the "trial justice's exclusion of Dr. Recupero's expert testimony deprived [him] of his constitutional right to present a defense." Moreover, defendant contends that the exclusion of this testimony cannot be considered harmless error.

In addition to his contentions about the exclusion of Dr. Recupero's proposed testimony, defendant also argues: (1) that the trial justice erroneously instructed the jury that Ms. Pedini's testimony did not need to be corroborated to support a guilty verdict, even though she did not testify about penetration; and (2) that the trial justice erroneously limited defendant's redirect examination concerning his preparation for trial.

**A**

**The Relevancy of Dr. Recupero's Testimony**

As his first argument, defendant asserts that expert testimony "about alcoholic blackouts is clearly relevant to the facts of consequence in a sexual assault prosecution based on incapacitation and/or helplessness." With regard to the facts of the instant case, defendant states that the "obvious inference" from Ms.

Pedini's lack of memory is that she "passed out" due to her intoxication, thus "suggesting mental incapacitation, physical helplessness, and an inability to consent." The defendant argues, however, that Dr. Recupero's testimony offered an alternative inference that could be drawn with respect to Ms. Pedini's professed lack of memory—namely, that her lack of memory was a function of an alcoholic blackout, wherein she could have been awake and able to consent even though intoxicated. In sum, defendant contends that the testimony would have made it "less probable that [Ms. Pedini] was mentally incapacitated and/or physically helpless and more probable that [Ms. Pedini] consented to foreplay and sexual activity with [defendant]." The state disagrees, arguing that Dr. Recupero's testimony "did not have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without it." (Internal quotation marks and brackets omitted.)

Pursuant to Rule 401 of the Rhode Island Rules of Evidence, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See State v. Virola*, 115 A.3d 980, 995 (R.I. 2015). This Court has further made it clear that "inherent in Rule 401 are two basic facets of relevant evidence," and the Court identified those as being "materiality and probativeness * * *." *Id.* at 996 (brackets omitted) (quoting *State*

- 26 -

*v. Thomas*, 936 A.2d 1278, 1282 (R.I. 2007)). The Court then stated that "if the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial and should be excluded." *Id.* (deletions and brackets omitted) (quoting *Thomas*, 936 A.2d at 1282). This Court has further stated that "decisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice; [and] this Court will not disturb those decisions on appeal absent an abuse of discretion." *State v. Moreno*, 996 A.2d 673, 683 (R.I. 2010) (brackets omitted) (quoting *State v. Pena-Rojas*, 822 A.2d 921, 924 (R.I. 2003)); *see State v. Gardiner*, 636 A.2d 710, 714 (R.I. 1994).

It is our view that, under the facts of this specific case, Dr. Recupero's testimony was not relevant as defined in Rule 401. Doctor Recupero's testimony did not make any of the facts of consequence to this case more likely or less likely. It was her testimony that "[e]veryone who drinks does not get blackouts." Moreover, she acknowledged that, while experiencing an alcoholic blackout, "some people can maintain a normal set of skills" whereas others may not be able to maintain the same set of skills. It is also worth noting that Dr. Recupero was unable to provide any testimony as to whether Ms. Pedini herself experienced an alcoholic blackout during the alleged sexual assault.

The trial justice noted that Dr. Recupero had no knowledge or opinion as to whether Ms. Pedini did indeed black out. To that end, the trial justice stated that

there was "no causal connection if you would or relationship between the complaining witness's alcohol blackout, if any, that she suffered on the morning of February 1 when she woke up and the acts of the night before." He determined that the proposed expert testimony had no relevance to the determination of whether defendant in fact penetrated Ms. Pedini while she was mentally incapacitated or physically helpless. The trial justice made a careful decision after considering the substance of Dr. Recupero's proposed testimony. It is our opinion that the trial justice did not abuse his discretion in ruling that Dr. Recupero's testimony was irrelevant as applied to the facts of this case.[5]

As a further aspect of his argument to the effect that the proposed testimony fell within the parameters of relevancy under Rule 401, defendant contends that the "trial justice erred in finding that Dr. Recupero's expert testimony would only be admissible if Dr. Recupero formed an opinion about whether [Ms. Pedini] experienced an alcoholic blackout." The defendant notes that the Court permits "fact-only"[6] expert testimony and that, here, Dr. Recupero's testimony "fit the facts of [defendant's] case, as there was considerable evidence that [Ms. Pedini]

[5] We do not mean to imply any criticism of Dr. Recupero's professional competence or the scholarly nature of her proposed testimony. We hold only that the trial justice did not abuse his discretion in excluding her testimony pursuant to Rule 401 of the Rhode Island Rules of Evidence in view of the facts of this particular case.

[6] We note that defendant uses the rather unusual term "fact-only" to describe Dr. Recupero's role as an expert witness in this case.

experienced an alcoholic blackout." To support that argument, defendant relies on this Court's recent opinion in *State v. Sheridan*, 252 A.3d 1236 (R.I. 2021). In our opinion, however, the factual context of *Sheridan* is readily distinguishable from the factual context of the instant case.

Rule 702 of the Rhode Island Rules of Evidence addresses the subject of expert testimony. It provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." In this case, Dr. Recupero's testimony was being offered for more than educational reasons. Although defendant contends that Dr. Recupero's testimony served the purpose of providing "general information about an established scientific phenomenon without opining whether the phenomenon had actually occurred," defendant also states that her testimony would have given the jury the opportunity to infer the alternative possibility that Ms. Pedini could have been awake and able to consent while intoxicated during the alleged sexual assault.

Turning to defendant's *Sheridan*-based argument, in spite of defendant's contention that the expert witness in *Sheridan* (Amy Goldberg, M.D.) was a "fact-only" expert, we deem that characterization to be inaccurate. While it is true that, in *Sheridan*, Dr. Goldberg testified that she "had not seen [the complaining

witness] for any examination or treatment and that she did not even know if there was a touching or what type of touches there were or were alleged," she rendered an opinion tied to the actual facts of the case—*viz.*, the *uncontested* fact that the complaining male witness became aroused and ejaculated during the alleged sexual assault. *Sheridan*, 252 A.3d at 1242, 1243 (brackets omitted).

Here, by contrast, Dr. Recupero's testimony was being proposed in relation to *contested* facts—*viz.*, whether Ms. Pedini was incapacitated and/or incapable of consenting at the time of the alleged sexual conduct. Stated differently, Dr. Recupero, as the trial justice noted, was unable to link her expert opinion to any of the uncontested empirical facts in the instant case. Moreover, Dr. Goldberg's testimony in *Sheridan* had a general educational purpose—explaining that it was physically possible that a non-consenting male could become aroused and ejaculate during a sexual assault. *Sheridan*, 252 A.3d at 1243. The *Sheridan* Court specifically emphasized that "Dr. Goldberg's testimony aided both the male and the female members of the jury in determining whether or not [the complaining witness] consented during the specific instance of alleged sexual assault which formed the basis of the charge against Mr. Sheridan * * *." *Id.* at 1246. As previously noted, in the instant case, Dr. Recupero's expert testimony lacked the requisite relevancy necessary for admission and would not have aided the jury as Dr. Goldberg's expert testimony potentially did in *Sheridan*. Accordingly, after

careful consideration, we conclude that defendant's reliance on *Sheridan* is unavailing.

As a result of our determination that the trial justice did not abuse his discretion in excluding Dr. Recupero's expert testimony as not satisfying the criteria set forth in Rule 401, we do not reach the remaining arguments that the parties raise with regard to this evidence. *See Gardiner*, 636 A.2d at 714 (declining to reach other evidentiary arguments as a result of the Court's upholding the trial justice's decision to exclude expert testimony pursuant to Rule 401); *see also Grady v. Narragansett Electric Company*, 962 A.2d 34, 42 n.4 (R.I. 2009) (noting this Court's "usual policy of not opining with respect to issues about which we need not opine").

## B

### The Jury Instruction

The defendant claims that the trial justice's jury instruction concerning Ms. Pedini's testimony confused the jury and prejudiced defendant. The defendant contends that the trial justice's instruction incorrectly suggested that Ms. Pedini's testimony alone could constitute proof of all the elements of the charged offense. Specifically, defendant argues that the evidence in this case was insufficient to warrant the instruction given by the trial justice—due to the fact that Ms. Pedini herself never testified as to penetration.

When reviewing jury instructions, "it is our duty to ensure that they adequately cover the law—in which event we will uphold them." *State v. Figuereo*, 31 A.3d 1283, 1288 (R.I. 2011) (internal quotation marks omitted). We have further stated that "[e]ven if a challenged jury instruction was erroneous, reversal is warranted only if a jury could have been misled to the prejudice of the complaining party." *Id.* (internal quotation marks omitted). In reviewing jury instructions, "it is our role to examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, and we review challenged portions of jury instructions in the context in which they were rendered." *Adefusika*, 989 A.2d at 475 (deletion omitted) (quoting *John*, 881 A.2d at 929).

In our opinion, there was sufficient evidence to support the trial justice's instruction. Ms. Pedini's own testimony provided a foundation for an inference that penetration occurred. She testified as to the pain in her vaginal and rectal areas which she experienced on the morning of the same day as the sexual assault that she alleged had occurred. In addition, she testified as to the blood which she said she found on her underwear on that morning. *See State v. Mensah*, 227 A.3d 474, 485 (R.I. 2020) (stating that the complaining witness's testimony as to the pain she experienced and the defendant's movements during the assault, both of which were consistent with anal penetration, was "sufficient to support a charge of

- 32 -

first-degree child molestation sexual assault"). Moreover, Ms. Pedini testified at length as to the Facebook Messenger messages between defendant and her wherein defendant conceded that he had penetrated her digitally and further stated that it was highly likely that he penetrated her vagina with his penis. Additionally, when testifying at trial, defendant admitted that penetration had occurred. We further underscore that the trial justice's jury instruction included language that, in order for Ms. Pedini's testimony to be sufficient proof of guilt beyond a reasonable doubt, the testimony had to be deemed credible as well as effectively establishing each of the elements of the offense charged. We perceive neither error nor prejudice to defendant in the trial justice's jury instruction.

## C

### The Limiting of Redirect Examination

As his final argument, defendant asserts that the prosecutor "opened the door to the redirect examination question about the number of times [defendant] practiced his testimony," but that he was "unfairly restricted from answering." To that end, defendant suggests that the prosecutor's cross-examination "created the misleading impression that [defendant] strategically used his prior statements to artfully craft his testimony." The defendant emphasizes that the redirect examination question would have involved a single question and answer.

This Court has held that "the scope of redirect examination is limited to matters testified to on cross-examination." *Studley*, 671 A.2d at 1231. On cross-examination, the prosecutor only asked the defendant if he had a copy of the police station interview transcript. At no point did the prosecutor inquire into the frequency with which the defendant and his counsel practiced his testimony. The trial justice underscored this very point when he stated that the prosecutor only: "asked [the defendant] if he had a copy. He said no. That was the end of it." Accordingly, it is our view that the trial justice did not abuse his discretion in limiting the redirect examination of the defendant.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. James Robinson. |
| **Case Number** | No. 2021-93-C.A. (P1/19-1489A) |
| **Date Opinion Filed** | July 13, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Stephen P. Nugent |
| **Attorney(s) on Appeal** | For State:<br><br>Mariana Ormonde<br>Department of Attorney General<br>For Defendant:<br><br>Camille A. McKenna<br>Rhode Island Public Defender |